[S.F. No. 23359. June 30, 1976.]

GITA LANDEROS, a Minor, etc., Plaintiff and Appellant, v.
A. J. FLOOD et al., Defendants and Respondents.

**COUNSEL**

Caputo & Liccardo, Caputo, Liccardo & Rossi, Richard P. Caputo and Richard J. Kohlman for Plaintiff and Appellant.

Rankin, Oneal, Center, Luckhardt, Marlais, Lund & Hinshaw, G. David Landsness, Campbell, Warburton, Britton, Fitzsimmons & Smith and Alfred B. Britton, Jr., for Defendants and Respondents.

## OPINION

**MOSK, J.**—In this medical malpractice action plaintiff Gita Landeros, a minor, appeals from a judgment of dismissal entered upon an order sustaining general demurrers to her amended complaint. As will appear, we have concluded that the complaint states a cause of action and hence that the judgment must be reversed.

Plaintiff brought the action by her guardian ad litem against A. J. Flood, a physician, and The San Jose Hospitals & Health Center, Inc. (hereinafter called the San Jose Hospital). The amended complaint purports to allege four "causes of action." As we shall explain, the first three of these are actually alternative theories of recovery alleged in support of a single cause of action for compensatory damages for personal injuries caused by defendants' negligence in failing to properly diagnose and treat the condition from which plaintiff was suffering; the fourth "cause of action" merely adds a claim for punitive damages on allegations that defendants' conduct in this respect was wilful and wanton. Defendants filed general demurrers. The court sustained the demurrers as to the first and second "causes of action" with leave to amend, and as to the third and fourth "causes of action" without leave to amend. Plaintiff elected to stand on her complaint as previously amended, and a judgment dismissing the entire action was therefore entered.[1]

The material factual allegations of the amended complaint are as follows. Plaintiff was born on May 14, 1970. On repeated occasions during the first year of her life she was severely beaten by her mother and the latter's common law husband, one Reyes. On April 26, 1971, when plaintiff was 11 months old, her mother took her to the San Jose Hospital for examination, diagnosis, and treatment. The attending physician was defendant Flood, acting on his own behalf and as agent of defendant San Jose Hospital. At the time plaintiff was suffering from a comminuted spiral fracture of the right tibia and fibula, which gave the appearance of having been caused by a twisting force.[2] Plaintiff's mother had no explanation for this injury. Plaintiff also had bruises over her entire back, together with superficial abrasions on other parts of her body. In addition, she had a nondepressed linear fracture of the skull,

---

[1] On this appeal plaintiff has expressly abandoned her claim of punitive damages.

[2] A comminuted fracture is "a fracture in which the bone is splintered or crushed into numerous pieces." (Webster's New Internat. Dict. (3d ed. 1961) p. 457.)

which was then in the process of healing.[3] Plaintiff demonstrated fear and apprehension when approached. Inasmuch as all plaintiff's injuries gave the appearance of having been intentionally inflicted by other persons, she exhibited the medical condition known as the battered child syndrome.

It is alleged that proper diagnosis of plaintiff's condition would have included taking X-rays of her entire skeletal structure, and that such procedure would have revealed the fracture of her skull. Defendants negligently failed to take such X-rays, and thereby negligently failed to diagnose her true condition. It is further alleged that proper medical treatment of plaintiff's battered child syndrome would have included reporting her injuries to local law enforcement authorities or juvenile probation department. Such a report would have resulted in an investigation by the concerned agencies, followed by a placement of plaintiff in protective custody until her safety was assured. Defendants negligently failed to make such report.

The complaint avers that as a proximate result of the foregoing negligence plaintiff was released from the San Jose Hospital without proper diagnosis and treatment of her battered child syndrome, and was returned to the custody of her mother and Reyes who resumed physically abusing her until she sustained traumatic blows to her right eye and back, puncture wounds over her left lower leg and across her back, severe bites on her face, and second and third degree burns on her left hand.

On July 1, 1971, plaintiff was again brought in for medical care, but to a different doctor and hospital. Her battered child syndrome was immediately diagnosed and reported to local police and juvenile probation authorities, and she was taken into protective custody. Following hospitalization and surgery she was placed with foster parents, and the latter subsequently undertook proceedings to adopt her. Plaintiff's mother and Reyes fled the state, but were apprehended, returned for trial, and convicted of the crime of child abuse. (Pen. Code, § 273a.)

With respect to damages the complaint alleges that as a proximate result of defendants' negligence plaintiff suffered painful permanent

---

[3] A nondepressed linear skull fracture is ordinarily detectable only by X-ray examination.

physical injuries and great mental distress, including the probable loss of use or amputation of her left hand.

The second and third "causes of action" are predicated on defendants' failure to comply with three related sections of the Penal Code. Section 11160 provides in relevant part that every hospital to which any person is brought who is suffering from any injuries inflicted "in violation of any penal law of this State"[4] must report that fact immediately, by telephone and in writing, to the local law enforcement authorities. Section 11161 imposes the identical duty on every physician who has under his care any person suffering from any such injuries. Section 11161.5 deals specifically with child abuse, and declares in pertinent part that in any case in which a minor is under a physician's care or is brought to him for diagnosis, examination or treatment, and "it appears to the physician" from observation of the minor that the latter has any physical injuries "which appear to have been inflicted upon him by other than accidental means by any person," he must report that fact by telephone and in writing to the local law enforcement authorities and the juvenile probation department.[5] All three sections require the report to state the name of the victim, if known, together with his whereabouts and the character and extent of his injuries; and a violation of any of the sections is a misdemeanor (§ 11162).

By means of allegations phrased largely in the statutory language plaintiff undertakes to charge defendants with a duty to comply with section 11161.5 (second "cause of action") and sections 11160 and 11161 (third "cause of action"), and avers that they failed to make the reports thus required by law. Her allegations of proximate cause and damages on these counts are essentially identical to those of the first count.

We have found no case directly in point, but the issues may be decided by reference to well settled principles. ■ Succinctly stated, the rules governing our consideration of this appeal are "that a general demurrer admits the truth of all material factual allegations in the complaint [citation]; that the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations]; and that plaintiff need only plead facts showing that he may be entitled to some relief [citation]." (*Alcorn* v.

---

[4]Among such laws, of course, are the statutes penalizing child abuse. (Pen. Code, §§ 273a, 273d.)

[5]The statute imposes the same duty on certain other health care professionals, school officials and teachers, child care supervisors, and social workers.

*Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]; accord, *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 123 [109 Cal.Rptr. 799, 514 P.2d 111]; *Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032].) ■ On the latter point it is clear that " 'In this state negligence may be pleaded in general terms, and that is as true of malpractice cases as it is of other types of negligence cases.' " (*Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 774 [270 P.2d 1], quoting from *Greninger* v. *Fischer* (1947) 81 Cal.App.2d 549, 552 [184 P.2d 694]; accord, *Rannard* v. *Lockheed Aircraft Corp.* (1945) 26 Cal.2d 149, 154-157 [157 P.2d 1]; *Guilliams* v. *Hollywood Hospital* (1941) 18 Cal.2d 97, 99-103 [114 P.2d 1]; *Weinstock* v. *Eissler* (1964) 224 Cal.App.2d 212, 236 [36 Cal.Rptr. 537].)

■ The standard of care in malpractice cases is also well known. With unimportant variations in phrasing, we have consistently held that a physician is required to possess and exercise, in both diagnosis and treatment, that reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of his profession in similar circumstances. (*Brown* v. *Colm* (1974) 11 Cal.3d 639, 642-643 [114 Cal.Rptr. 128, 522 P.2d 688]; *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 86 [147 P.2d 604]; *Hesler* v. *California Hospital Co.* (1918) 178 Cal. 764, 766-767 [174 P. 654].)

■ The first question presented, accordingly, is whether the foregoing standard of care includes a requirement that the physician know how to diagnose and treat the battered child syndrome.

It appears from the literature that the battered child syndrome was first tentatively identified and reported to the medical profession in the early 1950s. Further surveys and analyses of the syndrome followed, culminating in a landmark article published in 1962 in the Journal of the American Medical Association. (Kempe et al., *The Battered-Child Syndrome* (1962) 181 A.M.A.J. 17.) Since that date numerous additional studies of the condition have been undertaken, and their results and recommendations publicized in the medical journals.[6]

---

[6]A typical article in the field recites case histories of child abuse, points out the distinguishing signs and symptoms of the battered child syndrome, and advises the practicing physician how to detect and treat the condition. For a detailed survey of the medical literature on the topic from its beginning until 1965, see McCoid, *The Battered Child and Other Assaults Upon the Family: Part One* (1965) 50 Minn.L.Rev. 1, 3-19. A selection of the later articles is cited in Grumet, *The Plaintive Plaintiffs: Victims of the Battered Child Syndrome* (1970) 4 Family L.Q. 296, *passim.*

California courts have not been oblivious to this development. In a prosecution for child abuse reviewed in 1971—the same year as the events here in issue—the Court of Appeal held admissible the testimony of a physician identifying the typical elements of the battered child syndrome. (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 506 [95 Cal.Rptr. 919].) The court explained that a physician's diagnosis of battered child syndrome essentially means that the victim's injuries were not inflicted by accidental means, and "This conclusion is based upon an extensive study of the subject by medical science." (*Id.,* at p. 507.) Citing portions of the literature referred to hereinabove, the court concluded (*ibid.*) that "the diagnosis of the 'battered child syndrome' has become *an accepted medical diagnosis.*" (Italics added.) Indeed, the Court of Appeal added that "Trial courts have long recognized the 'battered child syndrome' and it has been accepted as a legally qualified diagnosis on the trial court level for some time . . . ." (*Id.,* at pp. 507-508; accord, *People* v. *Henson* (1973) 33 N.Y.2d 63 [349 N.Y.S.2d 657, 304 N.E.2d 358, 363-364]; *State* v. *Loss* (1973) 295 Minn. 271 [204 N.W.2d 404, 408-409].)

While helpful, the foregoing general history of the battered child syndrome is not conclusive on the precise question in the case at bar. The question is whether a reasonably prudent physician examining this plaintiff in 1971 would have been led to suspect she was a victim of the battered child syndrome from the particular injuries and circumstances presented to him, would have confirmed that diagnosis by ordering X-rays of her entire skeleton, and would have promptly reported his findings to appropriate authorities to prevent a recurrence of the injuries. There are numerous recommendations to follow each of these diagnostic and treatment procedures in the medical literature cited above.[7]

---

[7]For example, the leading article by Kempe et al., *op. cit., supra,* 181 A.M.A.J. 17, states that "A physician needs to have a high initial level of suspicion of the diagnosis of the battered-child syndrome in instances of subdural hematoma, multiple unexplained fractures at different stages of healing, failure to thrive, when soft tissue swelling or skin bruising are present, or in any other situation where the degree and type of injury is at variance with the history given regarding its occurrence . . . ." (*Id.,* at p. 20.) Of the different types of fractures exhibited, an arm or leg fracture caused by a twisting force is particularly significant because "The extremities are the 'handles' for rough handling" of the child by adults. (*Id.,* at p. 22.) The article also contains numerous recommendations to conduct a "radiologic examination of the entire skeleton" for the purpose of confirming the diagnosis, explaining that "To the informed physician, the bones tell a story the child is too young or too frightened to tell." (*Id.,* at p. 18.) Finally, on the subject of management of the case it is repeatedly emphasized that the physician "should report possible willful trauma to the police department or any special children's protective service that operates in his community" (*id.,* at p. 23) in order to forestall further injury to the child: "All too often, despite the apparent cooperativeness of the

Despite these published admonitions to the profession, however, neither this nor any other court possesses the specialized knowledge necessary to resolve the issue as a matter of law. We simply do not know whether the views espoused in the literature had been generally adopted in the medical profession by the year 1971, and whether the ordinarily prudent physician was conducting his practice in accordance therewith. ■ The question remains one of fact, to be decided on the basis of expert testimony: "The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; accord, *Brown* v. *Colm* (1974) *supra,* 11 Cal.3d 639, 643; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 236-237 [104 Cal.Rptr. 505, 502 P.2d 1]; *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 473 [234 P.2d 34, 29 A.L.R.2d 485].)

■ Inasmuch as the "common knowledge" exception to the foregoing rule does not apply on the facts here alleged, the trial court could not properly conclude as a matter of law that defendants' standard of professional care did not include the diagnostic and treatment procedures outlined in the complaint. Plaintiff is therefore entitled to the opportunity to prove by way of expert testimony that in the circumstances of this case a reasonably prudent physician would have followed those procedures.[8]

---

parents and their apparent desire to have the child with them, the child returns to his home only to be assaulted again and suffer permanent brain damage or death." (*Id.,* at p. 24.)

[8]Whether the physician would have followed the procedure of reporting plaintiff's injuries to the authorities, however, is not solely a question of good medical practice. The above-cited reporting statutes (Pen. Code, §§ 11160-11161.5) were in force in 1971. They evidence a determination by the Legislature that in the event a physician does diagnose a battered child syndrome, due care includes a duty to report that fact to the authorities. In other words, since the enactment of these statutes a physician who diagnoses a battered child syndrome will not be heard to say that other members of his profession would not have made such a report. The same is true of each of the persons and entities covered by this legislation. Accordingly, although expert testimony on the issue of a duty to report is admissible, it is not mandatory.

The statute also lays to rest defendant Flood's concern that if he were required to report his findings to the authorities he might be held liable for violation of the physician-patient privilege. (Evid. Code, § 992.) Section 11161.5 specifically exempts the physician from any civil or criminal liability for making a report pursuant to its terms.

Defendants complain that the first "cause of action" is nevertheless fatally defective because it assertedly fails to allege certain specific facts, i.e., that Dr. Flood negligently

■ The second principal question in the case is proximate cause. Under the allegations of the complaint it is evident that the continued beating inflicted on plaintiff by her mother and Reyes after she was released from the San Jose Hospital and returned to their custody constituted an "intervening act" that was the immediate cause in fact of the injuries for which she seeks to recover. (Rest.2d Torts, § 441.) ■ It is well settled in this state, however, that an intervening act does not amount to a "superseding cause" relieving the negligent defendant of liability (*id.,* § 440) if it was reasonably foreseeable: "[A]n actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct." (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151], and cases cited.) Moreover, under section 449 of the Restatement Second of Torts that foreseeability may arise directly from the risk created by the original act of negligence: "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, *or criminal* does not prevent the actor from being liable for harm caused thereby." (Italics added.) (See *Vesely v. Sager, supra,* at p. 164 of 5 Cal.3d, and cases cited.)

As we recently observed with respect to a determination of duty, however, "foreseeability is a question of fact for the jury." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) ■ The same rule applies when the issue is whether the intervening act of a third person was foreseeable and therefore did not constitute a superseding cause: in such circumstances "The foreseeability of the risk generally frames a question for the trier of fact" (*Weaver* v. *Bank of America* (1963) 59 Cal.2d 428, 434 [30 Cal.Rptr. 4, 380 P.2d 644]; accord, Rest.2d Torts, § 453, com. b).

---

treated plaintiff's leg fracture, that proper treatment of that fracture or the bruises on plaintiff's back included taking an X-ray of her skull, and that Dr. Flood negligently failed to ask plaintiff's mother for an explanation of the cause of the fracture. None of these allegations is necessary, however, because they are irrelevant to the gist of the complaint. Plaintiff's theory is that in the circumstances of this case the fracture, the bruises, and the lack of an explanation offered by her mother are themselves indicia of the underlying battered child syndrome of which plaintiff was the victim, and it was that condition which defendants negligently failed to diagnose and treat. For the reasons stated, the complaint adequately alleges the facts necessary to support such a theory.

■ We cannot say categorically that an ordinarily prudent physician who had correctly diagnosed that plaintiff was a victim of the battered child syndrome would not have foreseen the likelihood of further serious injuries to her if she were returned directly to the custody of her caretakers. On the contrary, it appears from the professional literature that one of the distinguishing characteristics of the battered child syndrome is that the assault on the victim is not an isolated, atypical event but part of an environmental mosaic of repeated beatings and abuse that will not only continue but will become more severe unless there is appropriate medicolegal intervention.[9] If the risk of a resumption of physical abuse is thus a principal reason why a doctor's failure to diagnose and treat the battered child syndrome constitutes negligence, under section 449 of the Restatement the fact that the risk eventuates does not relieve him of responsibility.

Accordingly, the trial court in the case at bar could not properly rule as a matter of law that the defendants' negligence was not the proximate cause of plaintiff's injuries. Plaintiff is entitled to prove by expert testimony that defendants should reasonably have foreseen that her caretakers were likely to resume their physical abuse and inflict further injuries on her if she were returned directly to their custody.[10]

---

[9]See, e.g., Kempe et al., *The Battered-Child Syndrome* (1962) 181 A.M.A.J. 17, 24, quoted in footnote 7, *ante*; Boardman, *A Project to Rescue Children from Inflicted Injuries* (1962) 7 Soc.Work 43, 49 ("Experiences with the repetitive nature of injuries indicate that an adult who has once injured a child is likely to repeat. . . . [T]he child must be considered to be in grave danger unless his environment can be proved to be safe"); Fontana et al., *The "Maltreatment Syndrome" in Children* (1963) 269 New England J. Med. 1389, 1393 ("over 50 per cent of these children are liable to secondary injuries or death if appropriate steps are not taken to remove them from their environment"); Friedman, *The Need for Intensive Follow-Up of Abused Children*, in Helping the Battered Child and his Family (Kempe & Helfer eds. 1972) chapter 6, page 79 ("it would appear from our investigations that the severe permanent damage associated with the 'battered child syndrome' usually does not occur with the initial incident. [Fns. omitted.] Identification of abuse at this time thus offers an opportunity for intervention with the goal of preventing subsequent trauma and irreversible injury to the child").

[10]Again defendant Flood presses only a technical point of pleading, claiming the allegation of proximate cause is fatally defective because the foreseeability of the intervening conduct of plaintiff's mother and Reyes is not specifically set forth. It is asserted that under the case law such an allegation is mandatory if the foreseeability of the intervening act does not clearly appear from the pleaded facts of negligence and injury. (See, e.g., *Frace v. Long Beach etc. Sch. Dist.* (1943) 58 Cal.App.2d 566 [137 P.2d 60].) As shown above, however, here the occurrence of the intervening act is the precise hazard to which defendants' conduct is alleged to have negligently exposed plaintiff, and the injuries pleaded are those which a reasonably prudent physician would have foreseen as likely to ensue from that negligence. In these circumstances "The allegations of the

■    There remain for consideration plaintiff's allegations that defendants violated Penal Code sections 11160, 11161, and 11161.5, summarized hereinabove, requiring doctors and hospitals to report certain injuries to the authorities.    ■    As noted at the outset, the complaint separately sets forth these violations as the second and third "causes of action." In fact, plaintiff has only one cause of action because only one of her primary rights has been invaded—her right to be free from bodily harm: "There was one injury and one cause of action. A single tort can be the foundation for but one claim for damages. [Citations.]" (*Panos* v. *Great Western Packing Co.* (1943) 21 Cal.2d 636, 638-639 [134 P.2d 242].) The charged statutory violations constitute simply an alternative legal theory in support of plaintiff's cause of action for personal injuries. Alternative theories of common law negligence and statutory liability may be pleaded in a single count (*Coleman* v. *City of Oakland* (1930) 110 Cal.App. 715, 721 [295 P. 59]) or in separate counts (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 296, p. 1969); or the statutory basis of liability need not be pleaded at all, as the trial court is required to take judicial notice of acts of the Legislature (Evid. Code, § 451, subd. (a)).

Pursuant to our duty to liberally construe pleadings with a view to achieving substantial justice (Code Civ. Proc., § 452), we therefore treat the second and third "causes of action" as alternative counts setting forth plaintiff's theory of statutory liability.    ■    The purpose of that theory is manifestly to raise a presumption that by omitting to report plaintiff's injuries to the authorities as required by law, defendants failed to exercise due care—a presumption now codified in Evidence Code section 669.[11] Defendant Flood correctly concedes that the complaint alleges facts showing compliance with the first, third and fourth of the conditions specified in subdivision (a) of section 669; he reiterates his

---

complaint are sufficient to present the issue" of proximate cause. (*Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303, 316-317 [59 Cal.Rptr. 463; 27 A.L.R.3d 884].)

[11]Insofar as relevant here, section 669 provides:
"(a) The failure of a person to exercise due care is presumed if:
"(1) He violated a statute, ordinance, or regulation of a public entity;
"(2) The violation proximately caused death or injury to person or property;
"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.
"(b) This presumption may be rebutted by proof that:
"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; . . ."

contention that the allegations of proximate cause are defective, but for the reasons stated above the point is not well taken. It follows that plaintiff is entitled to prove compliance with each of the four statutory conditions for invoking the presumption of lack of due care, shifting to defendants the burden of rebutting that presumption.[12]

■ Finally, defendants raise two questions of statutory interpretation. They contend that even if plaintiff may rely on Penal Code section 11161.5 in this case, she cannot invoke sections 11160 and 11161 because the latter are "general" statutes which have assertedly been superseded by the former as a "special" statute on the same topic. But such supersession occurs only when the provisions are "inconsistent" (Code Civ. Proc., § 1859), which is not here the case. Sections 11160 and 11161.5 are directed to different classes of persons, and hence are not inconsistent but complementary. Sections 11161 and 11161.5, on the other hand, are duplicative of each other to the extent that the former deals with physical injuries unlawfully inflicted on minors and the latter deals with the observation of such injuries by a physician. (See generally Note, *The California Legislative Approach to Problems of Willful Child Abuse* (1966) 54 Cal.L.Rev. 1805, 1814-1815.) But inasmuch as the same penalty is provided for a violation of each section (Pen. Code, § 11162), they do not present an irreconcilable conflict requiring one to give way to the other. (Compare *People* v. *Gilbert* (1969) 1 Cal.3d 475, 479-480 [82 Cal.Rptr. 724, 462 P.2d 580], and cases cited.) There is nothing to prevent the Legislature from imposing a reporting requirement on physicians in two separate statutes, even if their coverage apparently overlaps.

■ Defendants next contend that plaintiff can rely on section 11161.5 only if she can prove that Dr. Flood *in fact* observed her various injuries and *in fact* formed the opinion they were caused by other than accidental means and by another person—in other words, that his failure to comply with the reporting requirement of the statute was intentional rather than negligent. We first note that the complaint in effect so alleges,

---

[12]A number of recent commentators support this theory of liability. (See, e.g., Isaacson, *Child Abuse Reporting Statutes: The Case for Holding Physicians Civilly Liable for Failing to Report* (1975) 12 San Diego L.Rev. 743, 756-762; Ramsey & Lawler, *The Battered Child Syndrome* (1974) 1 Pepperdine L.Rev. 372; Fraser, *A Pragmatic Alternative to Current Legislative Approaches to Child Abuse* (1974) 12 Am.Crim.L.Rev. 103, 115 & fn. 51; Paulsen, *Child Abuse Reporting Laws: The Shape of the Legislation* (1967) 67 Colum.L.Rev. 1, 34-36; for a published recommendation to the same effect by one of plaintiff's counsel in the case at bar, see Kohlman, *Malpractice Liability for Failing to Report Child Abuse* (1974) 49 State Bar J. 118.)

thereby mooting the issue at this pleading stage. For the guidance of the court at the trial, however, we briefly address the point of proof.

The provision of section 11161.5 is ambiguous with respect to the required state of mind of the physician. It has been suggested that for the purposes of a criminal prosecution "the more reasonable interpretation of the statutory language is that no physician can be convicted unless it is shown that it *actually* appeared to him that the injuries were inflicted upon the child." (Italics added.) (Note, *The California Legislative Approach to Problems of Willful Child Abuse* (1966) 54 Cal.L.Rev. 1805, 1814.) We adopt that construction, as it resolves the ambiguity in favor of the offender. (*People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401].) It is also applicable in the present civil action, because the presumption of lack of due care is predicated inter alia upon proof that the defendant "violated a statute" (Evid. Code, § 669, subd. (a)(1)), here section 11161.5. If plaintiff wishes to satisfy that requirement, it will therefore be necessary for her to persuade the trier of fact that defendant Flood actually observed her injuries and formed the opinion they were intentionally inflicted on her.[13]

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

[13]By parity of reasoning, the same rule will apply if plaintiff elects to rely at trial on sections 11160 and 11161 as well.

This does not mean, of course, that plaintiff can meet her burden only by extracting damaging admissions from defendant Flood. "The knowledge a person may have when material to an issue in a judicial proceeding is a fact to be proven as any other fact. It differs from physical objects and phenomena in that it is a state of mind like belief or consciousness and cannot be seen, heard or otherwise directly observed by other persons. It may be evidenced by the affirmative statement or admission of the possessor of it. If he is silent or says he did not have such knowledge, it may be evidenced in other ways," i.e., by circumstantial evidence and the inferences which the trier of fact may draw therefrom. (*Oil Workers Intl. Union* v. *Superior Court* (1951) 103 Cal.App.2d 512, 532-533 [230 P.2d 71].) Plaintiff will therefore be entitled to introduce proof of facts alleged in her complaint as circumstantial evidence that defendant Flood possessed the requisite state of mind, and any conflict between such evidence and direct testimony of defendant Flood will be for the trier of fact to resolve.