EL DORADO HOTEL, INC., Appellant, v. COOLIDGE
BROWN, Respondent.

No. 13955

December 6, 1984            691 P.2d 436

*Cromer, Barker, Michaelson, Gillock & Rawlings,* and *Ken Bick,* Reno, for Appellant.

*Durney, Guinan & Brennan,* Reno, for Respondent.

## OPINION

By the Court, GUNDERSON, J.:

This appeal is from a judgment entered on a jury verdict, which awarded damages against appellant casino owner for false arrest and negligence. Because our review of the record indicates that there was sufficient evidence to sustain the verdict on the theory of negligence, we affirm.

Respondent Coolidge Brown is a respected career civil servant, employed as a government contracts officer at the United States Naval Air Station at Alameda, California. His complaint arose out of his arrest for cheating at appellant El Dorado Hotel and Casino ("El Dorado") in Reno, Nevada, on July 5, 1980. Prior to that incident Brown, a fifty-nine-year-old black man, had never been arrested and had no criminal record whatever.

At the time of his arrest Brown and his wife were vacationing in Reno, and were duly registered as paying guests of the El Dorado Hotel. At trial, Brown testified that on the day of his arrest, he had left his wife in their hotel room and had gone to El Dorado's casino to take advantage of the recreational gaming offered. He had approximately $1,400 in his possession. After playing craps for approximately forty-five minutes and winning some eighty dollars, Brown decided to try his luck on El Dorado's slot machines.

Brown began to play a one dollar slot machine located in the casino. As he played, he noticed that a nearby machine being patronized by a third party appeared to be paying off frequently. When the patron moved on to another machine, Brown began playing the new machine, in addition to the machine he had been previously playing.

While Brown was engaged in playing the two machines, a "slot mechanic"[1] employed by El Dorado noticed that the reels of the second machine were not working properly. The mechanic testified that, depending upon how Brown pulled the handle of the machine, it appeared the first reel on the machine would sometimes stick rather than spin normally.

Even though the slot mechanic knew the reels on a slot machine sometimes stick as a result of wear through use, he somehow concluded that Brown was cheating. The mechanic reported his observations to his shift supervisor, who in turn observed Brown playing the machine for approximately forty-five minutes. During this period, the slot machine apparently "blacked out" twice, terminating play and indicating a possible malfunction. Each time the machine blacked out it was either

[1] A "slot mechanic" is a casino employee trained in the service and maintenance of slot machines.

filled or serviced by slot mechanics; these mechanics returned the machine to operating status and allowed Brown to continue playing, wishing him "Good Luck!" as they did so. No attempt was made to remove the machine from service or to move Brown to a new machine.

After watching Brown play, the shift supervisor incorrectly decided that Brown was manipulating the machine. The supervisor then contacted Griffin Investigations, a private security company employed by the El Dorado specializing in the investigation of "known cheaters." When a Griffin agent arrived at the El Dorado, the shift supervisor pointed out Brown as the individual suspected of cheating. The agent told the supervisor that Brown was not a "known cheater." Nevertheless, it appears he also erroneously decided that Brown was in some fashion manipulating or taking advantage of the machine. The Griffin agent then suggested that the El Dorado employees call the Nevada State Gaming Control Board. Again, no attempt was made to remove the suspect machine from service, to inspect it, to move Brown to a different machine, or to request Brown to identify himself.

Two Gaming Control Board agents eventually arrived at the casino in response to El Dorado's request. After watching Brown play the machine for a few minutes, the agents placed Brown under arrest for cheating. El Dorado employees made no effort to intervene on Brown's behalf. The agents were never informed of the prior machine malfunctions. Brown was taken to a Reno jail, where he was held until he posted bail several hours later. We do not have the specific charges against Brown before us. However, they were apparently predicated on our gaming statutes, which render it unlawful to alter the selection of criteria which determine the amount or frequency of payment in a game. NRS 465.015; NRS 465.083. Under these statutes it is unlawful for a player knowingly to take advantage of a defect that permits manipulation of a slot machine's payoff criteria. However, although Brown was arrested and charged, all charges against him were subsequently dropped by the district attorney.[2]

Brown subsequently brought an action against the El Dorado for false arrest and negligence. At trial, testimony was adduced that the slot machine played by Brown had a "stop bracket" which was out of adjustment and that this defective adjustment could have caused the reels on the machine to "stick" without any intentional action on Brown's part. Despite this testimony, at the end of the presentation of respondent's case, El Dorado

---

[2]The district attorney dropped the charges after a preliminary hearing, concluding that there was insufficient evidence to obtain a conviction. At the time the charges were dropped, Brown apparently signed an agreement releasing the State Gaming Control Board from any civil liability stemming from his arrest.

moved for involuntary dismissal under NRCP 41(b). This motion was denied, and the jury later returned a general verdict in Brown's favor awarding him $25,000 in damages. Special interrogatories were not submitted to the jury, and the jury did not specify under which theory it found liability. El Dorado moved for judgment notwithstanding the verdict; the court denied the motion; judgment affirming the verdict was entered. El Dorado now appeals.

El Dorado maintains that there was insufficient evidence for the jury to have found in respondent's favor under either a false arrest or a negligence theory. We disagree. We discern sufficient evidence in the record to support a verdict under the theory of negligence, and we affirm the judgment of the district court.[3]

We begin by noting that in reviewing a jury verdict, we are limited to determining whether the jury's findings are supported by substantial evidence. Steen v. Gass, 85 Nev. 249, 253, 454 P.2d 94, 97 (1969). We may not weigh the evidence anew; we look at the facts from the viewpoint of the prevailing party. Smith v. Timm, 96 Nev. 197, 202, 606 P.2d 530, 532 (1980). It is the prerogative of the trier of fact to evaluate the credibility of the witnesses and to decide whom to believe. Ewing v. Sargent, 87 Nev. 74, 78, 482 P.2d 819, 821-822 (1971). On appeal we assume that the jury believed all the evidence favorable to the prevailing party and drew from the evidence all reasonable inferences in his favor. Steen v. Gass, 85 Nev. at 253, 454 P.2d at 97; Smith v. Timm, 96 Nev. at 202, 606 P.2d at 532.

With these principles in mind, we review some of the facts from which the jury could have inferred that El Dorado had been negligent. We turn first to the question of El Dorado's duty toward Brown. Brown was an invited guest of the hotel, utilizing the casino which had been provided for his recreation. It was El Dorado's duty as a proprietor to use reasonable care to keep the premises safe for its patrons. Early v. N.L.V. Casino Corp., 100 Nev. 200, 678 P.2d 683 (1984); *see also* Asmussen v. New Golden Hotel Co., 80 Nev. 260, 262, 392 P.2d 49, 49 (1964). "[T]he proprietor's duty to protect an invited guest from injury caused by a third person is circumscribed by the reasonable foreseeability of the third person's actions and the injuries resulting from the condition or circumstances which facilitated the

---

[3]In light of our determination that there is sufficient evidence in the record to support a verdict on a negligence theory, we do not address whether the award of damages could additionally have been sustained on the basis of the false arrest cause of action.

harm." Early v. N.L.V. Casino Corp., 100 Nev. 200, 678 P.2d at 684. The proprietor has a duty to take affirmative action to control the wrongful acts of third persons where he has reasonable cause to anticipate the act and the probability of injury. Thomas v. Bokelman, 86 Nev. 10, 13, 462 P.2d 1020, 1022 (1970). Our examination of the record discloses ample evidence from which the jury could have concluded that El Dorado's employees had reasonable cause to anticipate that their actions would result in Brown's wrongful arrest for cheating.

From Brown's description of his behavior, the jury could infer that a prudent person could have perceived Brown was behaving like any ordinary tourist. After all, Brown testified that he was playing two machines at the same time. This practice is common among tourist players, but could be viewed as unnatural for a slot cheater, who typically concentrates on the machine he is manipulating. Brown testified that he was playing the machine in a normal fashion, pulling the handle at random. El Dorado's witnesses testified to the contrary; the jury, however, could choose to believe Brown's testimony.

It is undisputed that the slot machine in question had a stop bracket which was out of adjustment. El Dorado had general knowledge that such a condition can occur without any fault on anyone's part, simply as a result of ordinary wear and tear. El Dorado also knew that sometimes slot machines are left "broken" by undetected slot cheaters. In either case, an unsuspecting person can begin playing the machine and ascribe his winning streak to having found a "hot machine." The jury therefore could find that El Dorado employees knew, or should have known, that the mere fact Brown was playing a machine which was out of adjustment did not justify either a conclusion that Brown had broken the machine or that he was intentionally taking advantage of its malfunction.

Furthermore, evidence was adduced at trial from which the jury could have concluded that El Dorado knew or should have known the machine was out of adjustment. The mechanic who brought Brown to the shift supervisor's attention had observed that the first reel was not working properly. The mechanic chose to believe that Brown was in some fashion manipulating the machine; however, at that point El Dorado, through its employee, clearly had notice that something was wrong with the machine. Moreover, the shift supervisor who was watching Brown play must have seen that the machine malfunctioned twice and had to be repaired by El Dorado mechanics.

At trial, Brown introduced into evidence fill slips which indicated that the machine had to be filled with coins four times in the

twently-four hours preceding Brown's arrest. An expert witness for Brown unequivocally testified that this number of fills within a twenty-four hour period was "abnormal," and that it would have been ordinary and prudent practice to check the machine under those circumstances. Although El Dorado offered testimony to the effect that four fills would not have been unusual given the high level of play over the July 4 weekend, we see no reason why the jury, sitting as the finder of fact, could not have chosen to believe the testimony of Brown's expert witness. Thus, again, based upon the testimony presented, the jury could legitimately have found that El Dorado knew or should have known that the slot machine was experiencing mechnical difficulties.

When El Dorado employees called Griffin Investigations, they were advised that Brown was not a known slot cheater. As the jury was entitled to consider, they could easily have ascertained Brown's identity and have discovered that he was a tourist, a registered guest of their hotel, a man of impeccable credentials and background. Also, the casino employees could have examined the slot machine before pursuing their suspicions against Brown. Instead, they summoned agents of the Gaming Control Board.

El Dorado employees testified that they simply called the Gaming Control Board and pointed Brown out as the man to watch. They stressed that the decision to arrest Brown was made solely by the Gaming Control Board members. It may be inferred that El Dorado employees never told the Gaming Control agents about the abnormal fill levels of the machine. Furthermore, so far as appears, they did not mention that the machine had malfunctioned while Brown was playing. They did not point out that Brown was a registered guest of the hotel in whose casino he was supposedly cheating. Although Brown was their guest and entitled to their protection against unreasonable intrusions, they not only made no effort to ensure that he had the opportunity to explain his behavior; they withheld information which bore favorably on his conduct.

On the basis of these facts, we believe the jury could legitimately have found that El Dorado breached its duty to protect Brown from foreseeable injuries by third persons while on its premises. El Dorado contends, however, that even if it had breached its duty of care toward Brown, the decision of the Gaming Control agents to arrest Brown was a supervening cause which operated to cut off El Dorado's liability. It is true that where an unforeseeable supervening cause intervenes between a defendant's negligence and a plaintiff's injury, the defendant is relieved of liability. *See* Van Cleave v. Kietz-Mill Minit Mart, 97

Nev. 414, 633 P.2d 1220 (1981). However, where a third party's intervening intentional act is reasonably foreseeable, a negligent defendant is not relieved of liability. Landeros v. Flood, 551 P.2d 389 (Cal. 1976). Further, the question of foreseeability is generally one for the jury. *See* Merluzzi v. Larson, 96 Nev. 409, 610 P.2d 739 (1980).

We believe that on the record presented in this case, the jury could have found that Brown's arrest by State Gaming Control agents was reasonably foreseeable. Indeed, one might infer that El Dorado desired just such a result when it called the agents to the casino and neglected to inform them of circumstances tending to suggest that Brown had not been cheating.

Our review of the briefs presented in this case leads us to the conclusion that El Dorado is essentially attempting to re-litigate issues already determined by the trier of fact. It is well established, however, that where a question of fact has been determined by the trier of fact, this court will not reverse that determination unless the judgment is clearly erroneous and not based on substantial evidence. Beverly Enterprises v. Globe Land Corp., 90 Nev. 363, 526 P.2d 1179 (1974). In this case, the jury decided to believe Brown's witnesses rather than El Dorado's. Such was its prerogative. The record contains ample evidence to sustain the jury's verdict.

Given the facts we have just reviewed, the jury award of $25,000 to Brown does not appear unreasonable. The damage he suffered was high. For fifty-nine years Brown had enjoyed an unblemished record. He had achieved a respected position as a civil servant with the United States government; he had raised five children. Two of his children—a daughter who is a Deputy District Attorney at the Alameda County District Attorney's office and a son who is a juvenile probation officer—testified that their father had been deeply shaken by the episode. His distress is understandable. While a guest of the El Dorado Hotel, playing the slot machines in the hotel casino as the hotel encourages its guests to do, Brown was forcibly detained and accused of cheating. Without being given the opportunity to offer any explanations, he was arrested, taken to the police station, and subjected to the unpleasant procedures which accompany booking. The jury, acting as the conscience of the community, determined that Brown is entitled to $25,000 as compensation for the indignities he has suffered. For our part, we cannot say the jury acted either unreasonably or as a result of passion and prejudice.

The other issues raised by the parties have been considered, and are without merit. Accordingly, we order the judgment affirmed.

SPRINGER and MOWBRAY, JJ., concur.

STEFFEN, J., with whom MANOUKIAN, C.J., agrees, dissenting.

I respectfully dissent.

In my judgment, the majority position creates an unsound precedent of such magnitude and potential for untoward consequences that a detailed dissent is warranted.

My studied review of the record revealed a factual blend of different hue than that described by the majority. I consequently find it necessary to draw in considerable depth from the reservoir of facts in evidence.

On the evening of July 5, 1980, an El Dorado slot mechanic, Roland Renshaw, observed Brown playing a dollar slot machine and reported to his shift supervisor, Mike Jones, what appeared to be irregularities in the manner in which Brown was playing the machine. According to Renshaw, depending on how Brown pulled the handle of the machine, the first reel on the machine would either stick or spin normally. By manipulating the handle, Brown could hold the first reel and usually did so when a cherry was in place, thus assuring a winning play. Jones also observed Brown's play intermittently over approximately forty-five minutes and concluded that Brown was deliberately manipulating the handle of the machine in order to stop the first reel and produce a winning combination. After notifying Steve Batis, an El Dorado employee assigned to internal security, who also observed Brown's activities, a decision was made to summon the expertise of Griffin Investigations, a private agency that verifies jackpots and "check[s] for cheaters" who may be working in gaming establishments.

The Griffin agent, Marlin Mills, who responded to the call, had been employed by the enforcement division of the Nevada State Gaming Control Board (Board) for a period of seven years and until just five days prior to the Brown incident. Mills was the senior agent supervisor for the Board at the time of his departure to the Griffin agency. His expertise and training included the detection of cheaters in both slot machines and table games, techniques of cheating slot machines and making arrests. Mills watched Brown playing the slot machine for ten to fifteen minutes and concluded that Brown was cheating. He testified that if someone was watching Brown he would pull the handle in a normal fashion; if not, and if Brown had a payout like a cherry on

the first line, he would "slap the handle" and the first reel would stop. Mills recommended that Jones call the Board.

In response to a call from El Dorado personnel, two Board agents arrived on the scene to investigate the possibility of a slot cheater. They were asked by an El Dorado employee to observe the play of Brown. After watching Brown for ten minutes, one of the Board agents, Thomas Deck, identified himself to Brown and asked him to follow the two agents to the El Dorado security office. Brown complied with agent Deck's instructions. Upon entering the security office, Deck placed Brown under arrest and advised him of his rights. Prior to confronting Brown, agent Deck testified that he observed Brown playing in a furtive manner whereby he would manipulate the handle on winning combinations so as to cause the first reel of the machine to remain stationary. Agent Deck further stated that no one encouraged or influenced him to arrest Brown and that he alone made that decision. The Board agent also testified that he was aware that there was a malfunction in the machine being used by Brown, but that the machine malfunctioned only as a result of the technique employed by Brown in manipulating the handle. Otherwise, to the "normal" player it would play "fine". Brown contradicted the foregoing testimony claiming that he did not manipulate the machine's handle. He noted, however, that on two or three occasions the first reel moved slower than the other reels.[1]

Since the majority views the issue of negligent slot machine maintenance as a linchpin for affirming liability against the El Dorado, it is appropriate to note the facts of record on the subject. The slot machine in question was examined by a qualified slot mechanic on June 29, 1980 for any defect in reel movement and was determined to be free of problems. Also, during the July 4, 1980 weekend when slot machine play was uncontrovertedly described as "exceptionally high," the machine had to be filled on four occasions. Although Brown's trial expert described four fills within a twenty-four-hour period as abnormal, he also admitted that the accuracy of that conclusion would depend on such variables as the volume of play and the current payout cycle of the machine. Additionally, the unrefuted evidence indicates that during the high volume weekend of July 4, 1980 several of El Dorado's machines had three or more fills and that

---

[1]Interestingly, the majority contends that "general knowledge" by El Dorado employees that a machine can fall into disrepair by ordinary wear and tear or by the intervention of slot cheats would justify a finding by the jury that Brown's play on a defective machine did not warrant a conclusion "that Brown had broken the machine. . . ." The record is utterly devoid of any testimony or evidence suggesting that anyone claimed or inferred that Brown broke the machine.

this was not considered unusual given the volume of play. Moreover, in the usual course of business, slot machine fills would not be analyzed by slot mechanics until the day following the previous twenty-four-hour period during which a recap sheet was prepared reflecting the number of fills on each machine. Daily worksheets and weekly computer sheets were also routinely checked for comments or complaints concerning the machines and whether a machine was holding "its theoretical par." Finally, Brown testified that the machine "blacked out" on two occasions prompting him to call for assistance. The record reflects that "black outs" are common occurrences resulting from an empty or jammed "hopper." Brown observed that on one occasion the machine was simply refilled with coins and that he did not know what was done on the other. In each instance, nevertheless, the machine was quickly returned to service. The above recital represents the sum and substance of the evidence concerning El Dorado's negligent maintenance of the machine. Expert testimony produced by both parties indicated that the stop bracket of the machine in question was out of adjustment, thereby creating a condition which would allow normal movement of all reels or stopping the first reel, depending on the pull of the handle. Contrary to the majority's assertion, there was no evidence or testimony indicating that the reels on the machine could stick without any intentional action on Brown's part.

I view the so-called negligent maintenance issue as a red herring since it has no bearing on the issue of El Dorado's liability. To be sure, the question of negligent maintenance lured the trial judge into concluding that the jury should resolve the issue and determine whether El Dorado's maintenance of the machine was the proximate cause of Brown's damages. Maintenance, or the lack thereof, thus became the legal lifeline to a situation that virtually demanded redress. Brown, after all, was a respected family man whose background of honest toil and dedication to family were exemplary. He responded to Nevada's extensively promoted recreational enticements and was sorely victimized for doing so. The parties stipulated at trial that the district attorney dismissed the criminal case against Brown because he did not feel he could prove the case beyond a reasonable doubt in a jury trial. A wise judgment, in my opinion, for it appears evident to me that the real culprit in this entire scenario is Nevada's law on the subject.[2] Board agent Deck testified that his

---

[2]At the time of the incident involving Brown, the statute in effect, but since repealed, NRS 465.080, read in pertinent part, as follows:

1. It is unlawful for any . . . person playing any licensed gambling game:
. . . .
"(c) To use any fraudulent scheme or technique, including but not limited to purposefully breaking or damaging any part of any slot

decision to arrest Brown was based on his belief that Brown was using a fraudulent scheme or technique to win money. The "fraudulent scheme or technique" was described by agent Deck as the "little handle pull" used by Brown to enhance his winnings.

The Griffin agent, Mills, testified that a person could simply "stumble across" the handle pulling technique used by Brown. Moreover, both Mills and Deck stated that no arrest would be made if a machine consistently malfunctioned to a player's advantage under a "normal" pull. So, under Nevada law as interpreted and implemented by the Board, if a patron runs across a malfunctioning machine that can be profitably exploited by a "normal" pull of the handle, he or she may do so indefinitely without criminal consequences. On the other hand, if a patron exercises intelligent perception in discovering and exploiting a machine malfunction which is produced by skillful handle manipulation, a crime is committed. Under such an amorphous policy or law, Brown came to Nevada. He left as a victim. The state, as part of the agreement to dismiss the criminal charge against Brown, received a release of liability. This left the appellant, El Dorado, as the only potential source available for the financial redress of the wrongs suffered by Brown.

Before reaching the issues, a further comment seems warranted concerning the dichotomy that pervades the essence of this case. The enormity of gaming crimes, including slot cheating, and the challenges they present to effective law enforcement are common knowledge. Such crimes affect both gaming licensees who suffer from increased costs and diminished profits, and the State of Nevada, which suffers from reduced tax revenues and increased law enforcement costs. The commonality of interest between licensees and the state in minimizing the incidence and magnitude of gaming crimes is apparent. On what is actually the same side of the coin but the other side of the dichotomy is the gaming patron upon whose patronage the gaming industry depends. Must it be inevitably concluded that a patron who discovers and exploits an "achilles heel" on a "one-armed bandit" is a cheater who is dishonestly motivated? I suggest not. It seems well within the realm of honest, human rationalization for a slot player to

machine or otherwise causing the machine to malfunction, to facilitate the alignment of any winning combination or the removal of money from the machine."

In my opinion the new statute revising the definition of offenses, NRS 465.015, is no better in the context of the type of situation that exists in this case. The latter statute, in pertinent part, states:

"1. 'Cheat' means to alter the selection of criteria which determine:

"(a) The result of a game; or

"(b) The amount or frequency of payment in a game."

conclude that any manipulation of a slot handle is fair, legal and proper so long as it is within the mechanical options of the machine and is not damaging to the machine. It is, I submit, most unlikely that licensees or the state would ever place patrons on written notice that pulling a slot machine handle in any manner other than as specified in the notice would subject them to criminal prosecution.

There were two theories of liability considered by the jury. The first, false arrest, was simply sidestepped by the majority. The second, negligence, is the basis upon which the majority affirms the court below. The jury did not indicate the theory upon which its verdict was based.

The evidence of record convinces me that as a matter of law, the El Dorado could not have been liable for false arrest. This conclusion is based in part upon the fact that the evidence conclusively shows that the El Dorado did not arrest Brown. It is well-settled law that where a person provides facts to an arresting officer and the officer, acting on his own judgment and discretion, makes a false arrest, the person providing the information is not liable for false arrest. *See* Conley v. Commerce Bank of St. Charles, 599 S.W.2d 48 (Mo.App. 1980); Johnson v. First National Bank & Trust Company of Lincoln, 300 N.W.2d 10 (Neb. 1980); McCord v. Tielsch, 544 P.2d 56 (Wash.App. 1975); Delp v. Zapp's Drug & Variety Stores, 395 P.2d 137 (Ore. 1964). *See also* Restatement (Second) of Torts 45A comment c (1965).

Here, agent Deck's uncontroverted testimony plainly showed that the El Dorado's employees neither requested nor directed him to arrest Brown. In fact, the record reflects no evidence that El Dorado employees sought to influence Deck or anyone else to arrest Brown. After the Griffin agent advised the El Dorado supervisor to contact the Board, El Dorado's employees did nothing more than call the Board and thereafter apprise its agents of respondent's location in the El Dorado. There was no evidence which indicated any scheme, design or concerted action between Deck and the El Dorado to arrest respondent. Deck testified that he arrested Brown based upon his own conclusion that Brown was cheating. Under these facts, the El Dorado was not, as a matter of law, liable for false arrest.

Furthermore, the evidence indicates that Brown's arrest was made after a determination by Deck that probable cause existed for an arrest under NRS 465.080. *See* footnote 2, *supra.* Deck testified that he saw Brown vary the manner in which he pulled the slot machine's handle, holding the first reel when a payout was visible on that reel. Upon that basis, Deck determined that

Brown was cheating. Under these circumstances, it appears that probable cause existed to arrest Brown.

Where an arrest or imprisonment is carried out under legal authority by a police officer who has determined that probable cause exists to arrest, no liability for false arrest attaches to that officer's actions. *See* Hernandez v. City of Reno, 97 Nev. 429, 634 P.2d 668 (1981). No liability for false arrest could attach to Deck's actions, as the arrest was not, by definition, "false."

Where, as here, probable cause existed to arrest Brown, the El Dorado was statutorily protected from civil liability. Even if the El Dorado's agents had questioned or detained Brown, the El Dorado would have been protected from civil liability for false arrest or false imprisonment under Nevada law.[3]

In light of the foregoing, it was error for the trial court to allow Brown's claim of false arrest to be considered by the jury.

I am equally convinced that Brown's allegations of negligence are without merit or legal significance. As previously noted, evidence adduced at trial showed that at the time Brown played the machine, the machine's stop brackets were out of adjustment. Brown charged that the machine's maladjustment was attributable to faulty maintenance on the El Dorado's part, that the El Dorado was on notice that the machine was mechanically malfunctioning

---

[3]At the time of Brown's arrest, NRS 465.101 provided, in pertinent part:

"2. Any licensee, or his officers, employees or agents may question any individual in his establishment suspected of violating any of the provisions of NRS 465.070 or 465.080. No licensee or his officers, employees or agents is criminally or civilly liable on account of any such questioning.

"3. Any licensee or his officers, employees or agents who have probable cause for believing that there has been a violation of NRS 465.070 or 465.080 in his establishment by any person may take such person into custody and detain him in the establishment in a reasonable manner and for a reasonable length of time. Such taking into custody and detention does not render such licensee or his officers, employees or agents criminally or civilly liable for false arrest, false imprisonment, slander or unlawful detention unless such taking into custody and detention are unreasonable under all the circumstances.

"4. No licensee or his officers, employees or agents are entitled to the immunity from liability provided for in this section unless there is displayed in a conspicuous place in his establishment a notice in boldface type clearly legible and in substantially this form:

Any gaming licensee, or his officers, employees or agents who have probable cause for believing that any person has violated any provision of NRS 465.070 or 465.080 prohibiting cheating in gaming may detain such person in the establishment for the purpose of notifying a peace officer."

The evidence adduced at trial indicated that a notice which complied with the statutory requirements of NRS 465.101(4), above, was posted at the El Dorado on the day in question.

and that, consequently, respondent's "false" arrest was reasonably foreseeable by the El Dorado. Thus, Brown concluded, any intervening actions by agent Deck in carrying out the arrest did not relieve the El Dorado from liability for negligence.

Even assuming, *arguendo,* and contrary to the evidence, that the El Dorado was negligent in the maintenance of the slot machine, there was no duty on El Dorado's part to protect Brown from the foreseeable consequences of his method of play. As observed previously, the trial testimony confirms that it is a crime in Nevada to take advantage of a mechanically defective slot machine by causing it to malfunction through means of a calculated handle pull. El Dorado was obligated to report suspected acts of cheating to Nevada's gaming authorities. El Dorado was, however, under no duty to repair the machine and prevent the potential for cheating.

The majority nevertheless suggest that the El Dorado should have removed the defective machine from play, directed Brown to other machines, or at least taken measures to eliminate the possibility of a malfunctioning machine before it caused law enforcement personnel to analyze the lawfulness of Brown's conduct. Regrettably, the majority fails to recognize that when a patron appears to be exploiting a defective machine by a special pull of the handle, a licensee is not permitted the luxury of disregarding the play, placing the machine out of service or directing the patron to another machine. It is the policy of Nevada law to detect and deal with cheaters, and licensees are required to cooperate in that endeavor. Nevada's cheating law applies with equal force to novices or professionals, villains or saints, the bucolic or urbane and is in no way dependent upon whether a machine is defective because of negligent maintenance or other causes.

The majority cites the case of Thomas v. Bokelman, 86 Nev. 10, 462 P.2d 1020 (1970), as authority for the proposition that the El Dorado had the duty to take affirmative action to control the wrongful acts of third persons so as to prevent injury to Brown. Unfortunately, the authority cited has no applicability to the instant case for at least three reasons. First, it cannot be said that the acts of the investigative personnel and gaming control agents were "wrongful." Second, the decision to arrest Brown for violation of Nevada's cheating law was a lawful governmental act over which the El Dorado had no control. Third, NRS 465.101 provides a clear basis for immunity to a licensee or its agents who question any patron suspected of violating Nevada's law against cheating. Additionally, such licensee and its agents are immune from civil or criminal liability for false arrest, false imprisonment, slander or unlawful detention where said licensee

or its agents, having probable cause for believing that a suspect is cheating, take such suspect into custody and detain him in a reasonable manner for a reasonable length of time. The statute thus reflects a state policy not to subject licensees or their agents to criminal or civil liability where they have questioned a suspect or reasonably taken a suspect into custody. In the instant case, as noted previously, the licensee neither questioned Brown nor took him into custody. Its agent simply directed the attention of qualified investigative personnel and gaming authorities to Brown and left total determination of the nature of Brown's conduct to the gaming control agent. *A fortiori,* the immunity intended by NRS 465.101 should apply.

In the context of this case, the majority's imposition of duty upon the El Dorado is in direct conflict with the existing policy of Nevada law. Failing to more than theoretically recognize that under current Nevada law, a gaming patron who causes a slot machine to malfunction to his advantage by manipulating the handle is committing a crime, the majority effectually proceeds to charge gaming licensees with the duty not to allow machine malfunctions to occur. Clearly, if machine malfunctions could be eliminated, the problem of cheating by handle manipulation would likewise become extinct. Meanwhile, a gaming licensee who seeks to avoid the consequences of the majority ruling is faced with two apparent and equally unpalatable alternatives: flawless machine maintenance or a disregard of the law. The former is questionably feasible and clearly not required or anticipated under current Nevada law providing civil and criminal immunity to a cooperating licensee who questions, detains or reports a suspected gaming law violator. The latter would place a license at risk and be contrary to public policy and unbecoming to this Court as instigator.

The majority's failure to recognize a licensee's duty under existing Nevada law is further manifest by the conclusion that the El Dorado somehow breached a duty to Brown by not advising the Board agents of the mechanical difficulties with the machine Brown was playing. Board agent Deck testified at trial that he could see that the machine was defective, thereby enabling Brown to provoke an advantageous malfunction by manipulating the handle. It is thus apparent that even if it were to be assumed that El Dorado's duty to Brown transcended its duty to abide by Board policy and Nevada law, the former duty was effectively satisfied by the fact that the mechanically defective condition of the machine was patently obvious to agent Deck. Brown's failure to prove a breach of duty by the El Dorado should be fatal to his negligence claim.

Moreover, the record contains no evidence from which the jury

could conclude that the El Dorado "reasonably foresaw" that Brown would suffer injury at the hands of a third party as a result of this negligence. Here, Brown's arrest is directly attributable to agent Deck's actions, a supervening cause.

Where an unforeseeable supervening cause intercedes between a defendant's negligence and a plaintiff's injury, the defendant is relieved of liability. *See* Van Cleave v. Kietz-Mill Minit Mart, 97 Nev. 414, 633 P.2d 1220 (1981). On the other hand, where a third party's interceding intentional act is reasonably foreseeable, a negligent party is not relieved of liability. Landeros v. Flood, 551 P.2d 389 (Cal. 1976). Although the question of foreseeability is generally one for the jury, Merluzzi v. Larson, 96 Nev. 409, 610 P.2d 739 (1980), it is necessary that the plaintiff adduce some competent evidence from which an inference or conclusion of foreseeability may reasonably be drawn. *See* Thomas v. Bokelman, *supra.* Here, no such evidence was produced.

In this case, there was no evidence from which the jury could find that if the Board's agents' actions were improper, such was a natural, probable and foreseeable consequence of El Dorado's negligence in maintaining and operating the slot machine. The majority nevertheless concludes that the El Dorado should have foreseen that a machine maintenance failure could result in a cheating opportunity over which the Board might assume an injudicious but rightful cognizance. I again conclude that the villain is Nevada's statutory law on the subject. El Dorado's responsibility was to comply with the dictates of the law and its enforcing agents. It is not a proper function of the law to facilitate liability against a licensee on grounds that an inappropriate application of an arguably unsound law by state agents is foreseeable to a cooperating licensee. A licensee should be able to rightfully assume lawful conduct by Nevada gaming control authorities and should not be accountable for failing to "foresee" contrary behavior by such officials.

Since the occurrence of the unfortunate incident here analyzed, the legislature has further cemented its intention that the result occasioned by the majority's holding not occur. Under NRS 465.101, as presently constituted: "No licensee or any of his officers, employees or agents is criminally or civilly liable: . . . (b) For reporting to the state gaming control board or law enforcement authorities the person suspected of the [gaming crime] violation." I consider the amended provision of NRS 465.101 just quoted as additional evidence of the legislative intent to prevent the type of liability created by the majority ruling. *See* Woofter v. O'Donnell, 91 Nev. 756, 542 P.2d 1396 (1975). Here, the El Dorado fully complied with the statutory

requisites for immunity. The record amply demonstrates that the El Dorado took every precaution to see that Brown was not precipitously or unfairly embarrassed or subjected to arrest and detention. Under such circumstances, an imposition of civil liability effectively undermines the gaming control purposes of the statute.

Respondent's guilt or innocence is not an issue in this appeal. I have no hesitation in concluding that Mr. Brown did not engage in intentional cheating. Nor did he deserve the unfortunate chain of events prompting this litigation. Nevertheless, for reasons hereinbefore stated, I do not perceive a sufficient evidential or legal basis upon which to affirm liability against the El Dorado.

I am convinced that the legislature has sought to formulate a sound policy for the promotion of lawful gaming activity. Licensees who, in good faith, seek to minimize gaming infractions actually promote a healthy gaming environment for those who are attracted to Nevada's gaming establishments. Fortunately, not all who are suspected of gaming crimes are guilty. Recognition of this fact is implicit in the statute providing immunity for false arrest and unlawful detention. Perhaps greater investigation and caution must be employed before arresting patrons charged with cheating by handle manipulation. Or perhaps both the gaming industry and the state need to reconsider the propriety of making handle manipulation to exploit a defect in a slot machine a criminal act. Advancing technology, greater casino surveillance and better servicing may provide a preferred alternative. There are no easy solutions. Obviously, the legalizing of handle manipulation to exploit machine defects could result in substantial additional revenue losses to gaming establishments and the state. It could also facilitate skimming, an ever present concern for state gaming authorities. In any event, it is clear that the El Dorado acted reasonably and responsibly under Nevada law in its approach to the problem presented by the circumstances. The El Dorado is entitled to the immunity provided by law. Moreover, I view with disfavor the prospect of the state obtaining a release of liability in return for dismissal of criminal charges which did not include the cooperating licensee. The state encourages or requires gaming licensees to report suspected gaming violations, makes the determination to arrest, then changes its position without apparent concern for the licensee in the release of liability.

For the reasons noted above, I would reverse.