NEVADA SAVINGS AND LOAN ASSOCIATION, Now Known as PRIMERIT SAVINGS BANK, Appellant, *v.* BARBARA M. HOOD, KATHRYN J. GREEN and JACQUELINE NEWMAN, n/k/a JACQUELINE ALTER, as Guardian of the Person and Estate of KATHRYN B. CLAYCOMB, Respondents.

No. 22017

NEVADA SAVINGS AND LOAN ASSOCIATION, Now Known as PRIMERIT SAVINGS BANK, Appellant, *v.* BARBARA M. HOOD, KATHRYN J. GREEN, and JACQUELINE NEWMAN, n/k/a JACQULINE ALTER, as Guardian of the Person and Estate of KATHRYN B. CLAYCOMB, Respondents.

No. 22661

October 23, 1992                    839 P.2d 1324

*Jimmerson, Davis & Santoro* and *Chrispin Rivera,* Las Vegas, for Appellant.

*Dyer & McDonald* and *Valerie J. Cooney,* Carson City, for Respondents Barbara M. Hood and Kathryn J. Green.

*Israel L. Kunin,* Las Vegas, for Respondent Jacqueline Newman n/k/a Jacqueline Alter.

## OPINION

By the Court, STEFFEN, J.:

Respondents Barbara Hood and Kathryn J. Green (hereinafter collectively "Hood")[1] filed an action against appellant Nevada Savings and Loan Association, now known as Primerit Savings Bank (Nevada Savings), alleging negligence, breach of contract, and negligent misrepresentation. The primary thrust of the action was that Hood acted upon negligent representations of an agent of Nevada Savings in determining how to protect her mother's money. Kathryn B. Claycomb (Claycomb or mother) was given access to her money by Nevada Savings and proceeded quickly to squander the entire sum. After a jury trial, Claycomb's money was restored through Hood, who received a money judgment equalling the amount of the misspent funds. For reasons noted hereafter, we conclude that Hood could not prevail in her action as a matter of law, and therefore reverse.[2]

### Facts

Viewing, as we must, the record in a light most favorable to the prevailing parties, the operative facts disclose that Hood, Claycomb's daughter, sought to protect her elderly, manic-depressive mother from the possibility of an improvident spending spree attributable to a maniacal episode. As a result of a discussion with a new accounts representative at Nevada Savings, Hood elected to invest her mother's funds in money market accounts

---

[1]It is not essential to include Hood's sister, Kathryn J. Green, in our analysis of this appeal. Her involvement in the operative facts of the action filed below was minimal or non-existent.

[2]In view of our disposition of this appeal, it is unnecessary to address the issues in Case No. 22661 involving Nevada Savings' third-party subrogation claim against Claycomb.

evidenced by two certificates of deposit (CDs). Hood decided on that course of action because she was told by the new accounts representative that the money could not be withdrawn without surrendering the CDs. Hood felt safe in the described transaction because she intended to maintain physical possession of the CDs, thereby effectively denying her mother access to the funds without first consulting with her daughter.

Although Hood had not sought to place her mother under a guardianship prior to the time relevant to this case, in 1978 Hood had received a power of attorney from her mother in order to facilitate Hood's management of her mother's financial affairs. There is nothing in the record to suggest that Hood acted in any way other than to protect and care for her mother. Importantly, it is uncontroverted that the money invested in the money market accounts (approximately $34,000) belonged to the mother. Both accounts were opened with signature cards vesting the accounts in the names of "Kathryn B. Claycomb or Barbara M. Hood or Kathryn J. Green." Notwithstanding the three names on the account, Hood emphasized at trial that the money was her mother's and that it was to be used for her benefit. It was also apparent from Hood's testimony concerning the longevity of her mother's family that she expected her mother to live a long life.

Prior to settling on the money market accounts, Hood had questioned the new accounts representative about the desirability of requiring two signatures for the withdrawal of any of her mother's funds. Hood was dissuaded from using the two-signature requirement because of the assurance given her by the Nevada Savings representative that any withdrawal of funds placed in the money market accounts would require surrender of the CDs.[3] Hood did retain possession of the certificates in reliance upon the efficacy of the representation made to her.

Unfortunately, Claycomb met a scoundrel by the name of Bye T. Moore who talked her into matrimony as a prelude to absconding with her money. Predictably, Claycomb went to Nevada Savings, closed her accounts, and opened a new interest-bearing checking account under the name of "Kathryn B. Claycomb A/T/F [as trustee for] Bye T. Moore. Two days later, Claycomb and the scoundrel were married and shortly thereafter they presented the certificate of marriage to Nevada Savings as a basis for having the checking account changed to a joint account vesting in the names of "Kathryn B. Claycomb or Bye T. Moore." Within six weeks, Claycomb's funds were depleted and the scoundrel had left for parts unknown. Understandably, Hood was distressed to

---

[3]The new accounts representative was apparently unaware that the law regarding CDs had changed the previous year and no longer required the presentation of the CD to withdraw funds.

discover that her mother had been able to withdraw her funds and close the money market accounts without presenting the certificates of deposit.

## Discussion

Unfortunately, Nevada Savings had no alternative other than to deliver the mother's funds to her upon her demand and Hood should not have received the benefit of a judgment for money damages since, in legal contemplation, she sustained no damage. Moreover, since the money belonged to Claycomb, who actually received the funds from Nevada Savings and thereafter used them, there is no legal basis for requiring Nevada Savings to pay out the money twice.

The first reason why the judgment should not be allowed to stand is dictated by statute. NRS 100.085(1) provides:

When a deposit has been made in the name of the depositor and one or more other persons, and in form to be paid or delivered to any one of them, or the survivor or survivors of them, the deposit is the property of the persons as joint tenants. The money or property shall be held for the exclusive use of the persons named, and may be paid or delivered to any of them during the lifetime of all, or to the survivor or survivors after the death of the depositor, *and payment or delivery is a valid and sufficient release and discharge of the depository.*

(Emphasis added.) NRS 104.4405(1) provides:

A payor or collecting bank's authority to accept, pay or collect an item or to account for proceeds of its collection if otherwise effective is not rendered ineffective by incompetence of a customer of either bank existing at the time the item is issued or its collection is undertaken if the bank does not know of an adjudication of incompetence. *Neither death nor incompetence of a customer revokes such authority to accept, pay, collect or account until the bank knows of the fact of death or of an adjudication of incompetence and has reasonable opportunity to act on it.*

(Emphasis added.)

Within the context of the instant case, the thrust of the above statutes is clear. When a deposit has been made in the name of the depositor (in this case Kathryn Claycomb) and other persons who are also authorized to draw against the deposited funds, payment by the bank to any of the authorized persons constitutes a release

and discharge of the bank. Moreover, the bank's release and discharge is unaffected by the incompetence of the depositor or other authorized signatories on an account unless the bank is made aware of *an adjudication* of incompetence. Here, Claycomb, the depositor and authorized signatory on the bank's signature card, actually, recieved her money from the bank and she had not been adjudicated incompetent. Nevada Savings was released and discharged from liability as a matter of law. No verbal misrepresentation by a bank employee to someone other than Claycomb concerning how the money could be withdrawn serves to deprive Nevada Savings of the protection of the referenced statutes where the money was lawfully paid over to the depositor.[4]

The second reason we will address that supports reversal of the judgment is Hood's lack of standing to maintain an action against Nevada Savings. The record unequivocally establishes that the funds at issue belonged to Kathryn Claycomb, the mother. Hood asserted no claim of entitlement to the funds and indeed had nothing more than a bare expectancy that she might one day inherit whatever may have remained of the deposited funds. Hood testified that she expected her mother to live a long time and that she intended only to manage the money for the care of her mother. Although it is extremely unfortunate that the mother squandered her money under the influence of the scoundrel who married her, it is nevertheless clear that Claycomb actually received it from Nevada Savings at her own lawful insistence.

Despite the fact that the new accounts representative at Nevada Savings negligently advised Hood, no damage was sustained by Hood as a result. Claycomb had not been adjudicated an incompetent and Hood elected to have Claycomb listed on the account in a manner that would allow her to withdraw her funds. Although Claycomb did not spend her money wisely, as Hood had planned, it was still Claycomb's money, and it is strictly a matter of conjecture whether, upon the mother's demise, any of the funds would have remained for Hood.

Nevada Savings lawfully delivered Claycomb's money to her upon demand and we are unaware of any legal principle that would justify a judgment requiring Nevada Savings to pay out the money a second time to Claycomb or to Hood on her mother's behalf.

We consider the points discussed above to be dispositive of this

---

[4]Although Hood actually purchased the money market certificates from Nevada Savings with Claycomb's money, and in one sense is the "depositor," this fact is of no legal significance to our analysis.

appeal and therefore elect not to address other issues raised. Considering the financial hardship that Claycomb will suffer, and perhaps Hood as well if she feels compelled to use some of her own resources to help compensate for the wasted funds, we are especially reluctant to overturn the jury's verdict and the judgment entered pursuant thereto. However, as observed previously, there are no principles of law or equity revealed by our research that would sanction the imposition of liability against Nevada Savings under the circumstances of this case.

For the reasons discussed above, the judgment entered pursuant to the jury verdict is reversed.

SPRINGER and ROSE, J J., concur.

YOUNG, J., with whom MOWBRAY, C. J., joins, dissenting:

Because I believe that the majority opinion does not do justice in this case, I feel that I must dissent.

Originally, Mrs. Hood approached Nevada Savings intending to buy a treasury bill. However, the new accounts representative informed Mrs. Hood that treasury bills were not available through Nevada Savings and advised her to purchase CDs through Nevada Savings instead.

Mrs. Hood expressed concern over having her mother's name on the accounts and *specifically* inquired whether she should set up the accounts to require two signatures in order to withdraw the funds. Mrs. Hood informed Nevada Savings that she wanted to protect her elderly manic-depressive mother from the possibility of improvidently dissipating her funds during an emotional episode. She was assured that the certificates were required to withdraw money from the account. Mrs. Hood also expressed concern regarding the discrepancy between the terms of the signature card and her understanding that the CDs must be presented in order to withdraw the funds. Again, she was assured that the CD was required to make a withdrawal and that the signature card was simply a standard form which Nevada Savings kept on file for verification.

Relying on this information, Mrs. Hood purchased the CDs upon these express representations by Nevada Savings. This court has consistently held that where a bank customer makes a specific inquiry, she is entitled to rely on the representations made by bank personnel. Nevada Nat'l Bank v. Gold Star Meat Co., 89 Nev. 427, 431, 514 P.2d 651, 654 (1973); *see also* Bank of Nevada v. Butler Aviation, 96 Nev. 763, 616 P.2d 398 (1980). Mrs. Hood was continually reassured that her mother could not withdraw the funds without the certificate itself.

It is unconscionable that Nevada Savings now argues that Mrs. Hood was not justified in relying on its representations due to the

discrepancy between its repeated assurances and the language of the signature card. In support of its argument, Nevada Savings cites to Jones v. Chiado Corp., 670 P.2d 403 (Ariz.Ct.App. 1983). This case, upon which Nevada Savings relies so heavily, has been severely limited by Lubin v. Johnson, 820 P.2d 328 (Ariz.Ct.App. 1991). There, the court stated that *Chiado Corp.* may no longer be the law and went on to say: "We are unwilling to endorse the idea that victimization of the ignorant has legal sanction." *Id.* at 328-29.

I am unwilling to endorse the idea that victimization of the innocent and mentally afflicted has legal sanction in the State of Nevada. I believe that todays opinion will permit banks to act as they please and dispense inaccurate advice without concern for the effect it may have on an innocent customer. For that reason alone, I believe that the majority's opinion is fatally flawed.

The standard for justifiable reliance in Nevada is whether the person had information which would serve as a danger signal. Collins v. Burns, 103 Nev. 394, 397, 741 P.2d 819, 821 (1987). Here, Mrs. Hood specifically asked about the wording of the signature card and was assured that the CDs must be presented along with a signature to withdraw funds from the accounts. Mrs. Hood acted as a reasonably prudent person who, when she saw cause for concern, communicated her worries and was given a plausible answer. Clearly, Mrs. Hood justifiably relied on Nevada Savings' representations.

On the Nevada Savings CDs was the bank's logo—"Big. Safe. Friendly." By convincing Mrs. Hood that the bank could meet her needs and by enticing her to purchase CDs from it, instead of going elsewhere to buy a treasury bill, Nevada Savings showed that is was friendly. There is no question that the bank was big. However, Mrs. Hood might be pardoned if she now questions whether the bank was "safe." The evidence would seem to suggest that Nevada Savings was anything *but* safe for Mrs. Hood and her mother, Mrs. Claycomb. I am aware that a slogan of PriMerit Bank, which has taken over Nevada Savings, is "The Bank That Listens." Hopefully, this portends a new awareness of customer needs and a more lasting concern for client protection.

On December 6, 1985, Nevada Savings allowed Mrs. Claycomb to withdraw all the money in the CD accounts on the basis of her signature alone. Nevada Savings knew something was amiss in the series of events which took place after Mrs. Claycomb withdrew the funds from the CD accounts. For some unexplained reason, when Mrs Claycomb changed her new account, on which she was listed as trustee for Mr. Moore, to a joint account in the names of Mr. Moore and herself, she presented their recently acquired marriage license. It was not the

policy of the bank to ask for a marriage certificate upon adding a name to an account. Nevada Savings was apparently suspicious of the circumstances because it made a special note on the record of the transaction that the marriage license had been presented.

One can only speculate as to why Nevada Savings took such special care to note the presentation of the marriage license when the license was not required to change the names on the account. Presumably, Nevada Savings was apprehensive about the turn of events and wanted additional documentation to insulate it from any accusations of impropriety.

Nevada Savings was rightly concerned about its conduct. It had no business allowing Mrs. Claycomb to withdraw the funds because it had expressly promised Mrs. Hood, who was watching over these funds because of her mother's manic-depressive condition, not to allow such an event to occur. At the very least, it could have communicated with Mrs. Hood to let her know what was occurring. It would have been both simple and expedient to have called Mrs. Hood on the telephone to let her know that she had been misinformed. Mrs. Hood would then have had time before funds were disbursed to take appropriate steps.

In my opinion, Nevada Savings is estopped from asserting the defense that it was bound by law to release the funds to Mrs. Claycomb. The elements of estoppel are:

> (1) the party to be estopped must be apprised of the true facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting estoppel has the right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; (4) he must have relied to his detriment on the conduct of the party to be estopped.

Cheqer, Inc. v. Painters & Decorators, 98 Nev. 609, 614, 655 P.2d 996, 998-99 (1982) (citations omitted). Clearly, all the elements are met here. Nevada Savings knew the true facts regarding whether the CDs must be presented to withdraw the funds. Indeed, at trial Nevada Savings personnel repeatedly testified that the CDs were not required to withdraw funds from the accounts. Nevada Savings intended its representations to be acted upon; if Mrs. Hood did not purchase the CDs, Nevada Savings would have lost the investment. It goes without saying that Mrs. Hood was ignorant of the true facts; if she had known that Nevada Savings could not safeguard the funds as it promised her that it could, she would have taken her business elsewhere.

There is no question that Mrs. Hood relied on the representations to her detriment. Mrs. Hood was the de facto trustee for her mother. She had a fiduciary duty to safeguard and manage her

mother's money. When the bank, without so much as a telephone call, precipitantly released the funds to Mrs. Claycomb and Bye T. Moore, who artfully persuaded her to marry him, the result was predictable. In a few short weeks, both Moore and the money were gone. This predatory lothario drove off into the sunset, disappearing not only with the newly purchased Cadillac but the remaining monies as well. Mrs. Claycomb was apparently left nearly penniless.

Arguably, Mrs. Hood did not fulfill her duty to safeguard the funds and could be liable for that breach. Additionally, Mrs. Hood will presumably be forced to spend her own money to assist in supporting her mother. Mrs. Hood testified at trial that after the funds were dissipated, her mother was forced to take in a roommate at the residential hotel where she was living because there simply was not enough money to allow her mother to live alone. Mrs. Hood inferred that she assists her mother financially.

I would therefore hold that Nevada Savings is estopped from asserting its defenses in the face of its unconscionable conduct.