NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3139
_____

DDRA CAPITAL, INC.,
a Nevada Corporation; JOHN K. BALDWIN,
                                                            Appellants

v.

KPMG, LLP, a Delaware Limited Liability Partnership

_____

On Appeal from the District Court
for the Virgin Islands
(D.C. Civil No. 1-04-cv-00158)
District Judge: Honorable Anne E. Thompson
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 23, 2016

Before: MCKEE[*], Chief Judge, SMITH['], and SCIRICA, Circuit Judges

(Filed: September 6, 2017)

---

[*] Judge McKee was Chief Judge at the time this appeal was submitted. Judge McKee completed his term as Chief Judge on September 30, 2016.
['] Honorable D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on October 1, 2016.

—————————

OPINION[*]

—————————

SCIRICA, *Circuit Judge.*

Plaintiffs John Baldwin and DDRA Capital, Inc., appeal the grant of summary

judgment in favor of defendant KPMG, LLP. We will affirm in part and reverse in part.

**I.**

Through his company, Sunset Management, Baldwin helped DDRA, a Nevada

corporation whose president and sole shareholder was Shawn Scott, finance and

purchase the Delta Downs Racetrack in Louisiana in 1999. After DDRA successfully

sought a local referendum authorizing slot machines in the parish, it sold the track in

2001 for a profit of approximately $74 million. Baldwin earned a $10 million fee from

DDRA and substantial interest from the $17 million in loans Sunset had extended.

Scott and Baldwin, experienced businessmen who had worked together before,

considered several options to minimize the taxes they would pay on these gains. They

considered reinvesting the profits in "like kind" exchanges under I.R.C. § 1031,[1]

—————————————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged

acquiring companies with net operating losses, and pursuing various options proposed by Cornerstone Strategic Advisors and The Heritage Group. Ultimately, however, they chose a tax strategy suggested by Carl Hasting of KPMG.

The transaction Hasting proposed was unlawful, and KPMG knew it. (KPMG would later enter into a deferred prosecution agreement with the government for promoting such unregistered and fraudulent tax shelters.) The essential terms of the transaction, known as Short Option Strategy ("SOS"), had been flagged for disallowance by the IRS in August 2000. *See Tax Avoidance Using Artificially High Basis*, I.R.S. Notice 2000-44, 2000-2 C.B. 255.

SOS involved the purchase and sale of largely offsetting options on foreign currency so as to put at risk only the net premium paid to secure the options. (DDRA, for example, spent only $613,000 when it bought "long" options on Brazilian and Mexican currency for $49,238,000 and sold offsetting "short" options on the same currency for $48,625,000.[2]) Both the long and short options were then transferred to a partnership and, in purported reliance on an old Tax Court opinion, the taxpayer's basis in the partnership was calculated based solely on the value of the long options. *See, e.g., Sala v. United States*, 613 F.3d 1249, 1250-51 & n.2 (10th Cir. 2010). DDRA's basis in the

---

solely for property of like kind which is to be held either for productive use in a trade or business or for investment." I.R.C. § 1031(a)(1).

[2] DDRA sold a "short" option on Brazilian debt for $19,825,000 and bought an offsetting "long" option for $20,150,000, thus leaving it only $325,000 out of pocket. It also sold an option on Mexican debt for $28,800,000 and bought an offsetting option for $29,088,000. Baldwin engaged in similar transactions of a smaller magnitude.

partnership, accordingly, was considered to be $49,238,000 rather than the actual net loss of $613,000 it had thus far accrued. Finally, all options would be disposed of for an amount near the actual net cost of the offsetting options, thus leaving the taxpayer claiming a tax loss in the vicinity of the value of the long options—in DDRA's case, about $48 million, "even though the taxpayer ha[d] incurred no corresponding economic loss." I.R.S. Notice 2000-44.

Because "a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences" and "[a]n artificial loss lacking economic substance is not allowable," I.R.S. Notice 2000-44 (citing, inter alia, *ACM P'ship v. Comm'r*, 157 F.3d 231, 252 (3d Cir. 1998)), SOS clearly and categorically fails under I.R.C. §§ 165 and 752.[3] Nonetheless, Hasting told Baldwin and DDRA that SOS was legal, and Baldwin and DDRA decided to use the SOS transaction to minimize their 2001 taxes. As a result, DDRA and Baldwin claimed ordinary loss deductions of nearly $48 and $22 million, respectively, on their 2001 tax returns.

---

[3] I.R.C. § 165 provides rules for the treatment of losses and states generally that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." *Id.* § 165(a). IRS regulations interpreting I.R.C. § 165 make clear that "[o]nly a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." 26 C.F.R. § 1.165-1(b). I.R.C. § 752 provides for the treatment of a partner's share of liabilities of a partnership. As relevant here, it provides that "any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership." *Id.* § 752(b). Under SOS, the taxpayer ignores this provision by claiming that his basis in the partnership interest "is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options." I.R.S. Notice 2000-44.

4

After the government discovered KPMG's criminal promotion of SOS, plaintiffs accepted an IRS global voluntary settlement offer and paid the taxes the IRS demanded would have been due but for the specious SOS arithmetic ($8,554,685.00 for Baldwin and $17,121,602.00 for DDRA), plus interest ($1,288,449.96 for Baldwin and $3,328,297.01 for DDRA) and certain penalties ($855,468.50 for Baldwin and $1,712,160.20 for DDRA). Plaintiffs then sued KPMG for fraud, negligent misrepresentation, negligence, and breach of fiduciary duty, all under Nevada law, and for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. The District Court granted summary judgment in favor of KPMG on all claims.

**II.**

We exercise plenary review over the entry of summary judgment. *E.g.*, *Miller v. Eichleay Eng'rs*, 886 F.2d 30, 35 (3d Cir. 1989). Summary judgment is proper if a moving defendant "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a)—that is, if "there exists no genuine issue of material fact that would permit a reasonable jury to find for" plaintiffs, *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). We view the evidence in the light most favorable to plaintiffs, and draw all inferences in their favor, *e.g.*, *Interstate Outdoor Adver., L.P. v. Zoning Bd.*, 706 F.3d 527, 530 (3d Cir. 2013), and "may not weigh the evidence or make credibility determinations," *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). But summary judgment may be granted "if the motion and supporting materials—including the facts considered undisputed—show [the

5

defendant] is entitled to it," Fed. R. Civ. P. 56(e)(3). Summary judgment is also appropriate "[i]f the evidence is merely colorable, or is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted). If plaintiffs' version of the facts, as a matter of law, do not entitle them to relief, that is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).

For the following reasons, we will affirm the grant of summary judgment on plaintiffs' fraud and negligent misrepresentation claims because a reasonable jury could not find plaintiffs justifiably relied on Hasting and KPMG's misrepresentations. But we will reverse the entry of judgment on plaintiffs' negligence claims because plaintiffs have produced sufficient evidence of proximate cause. We will also reverse the dismissal of plaintiffs' RICO claims. In addition, we will affirm the entry of summary judgment on plaintiffs' breach of fiduciary duty claims because a reasonable jury could not find a confidential or special relationship between plaintiffs and KPMG.

**A.**

**1.**

Under Nevada law, both fraud and negligent misrepresentation claims require proof of justifiable reliance. *E.g., Collins v. Burns*, 741 P.2d 819, 821 (Nev. 1987) (fraud); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998) (negligent misrepresentation). While justifiable reliance does not normally require the recipient of

6

material statements to investigate their veracity, that is not the case when the relying party knows of "facts to alert [him] his reliance is unreasonable." *Collins*, 741 P.2d at 821. Although negligence is not a defense to fraud, "[t]he test is whether the recipient has information which would serve as a danger signal and a red light to any normal person of his intelligence and experience." *Id.* "If the [recipient] is aware of facts from which a reasonable person would be alerted to make further inquiry, then he or she has a duty to investigate further and is not justified in relying on" the statements. *Woods v. Label Inv. Corp.*, 812 P.2d 1293, 1298 (Nev. 1991) (per curiam) (discussing *Collins*, 741 P.2d at 821) (real property transaction).

### 2.

Like the District Court, although for different reasons,[4] we conclude plaintiffs have failed to point to evidence that they justifiably relied on Hasting or KPMG's assertions that the proposed transaction was legal after they ignored red flags that it was not. Accepting as true the evidence plaintiffs have adduced, and drawing all reasonable inferences in their favor, we find no dispute of fact material as to whether plaintiffs justifiably relied on Hasting and KPMG's misrepresentations. Accordingly, we will affirm the grant of summary judgment on plaintiffs' fraud and negligent misrepresentation claims.

Although plaintiffs may not have understood the minute details of the transaction Hasting proposed, they knew and were aware—by their own admission—

---

[4] "We may affirm the district court on any ground supported by the record." *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

that there was a crucial red flag that should have prompted them to conduct further investigation. That red flag was not that they were led to believe that they might not have to pay much in taxes, or, as the district court reasoned, that plaintiffs knew the transaction was "too good to be true." A838. The red flag was the knowledge that, under the proposed transaction, plaintiffs did not believe they or their entities would suffer actual losses but still planned to claim those losses as deductions. Plaintiffs did not need to know the intricacies of tax law to see this red flag.

We are compelled to conclude from the undisputed evidence, even while drawing all reasonable inferences in plaintiffs' favor, that they knew the proposed SOS transaction, rather than actually losing them money, would instead generate artificial losses they would claim for tax purposes. Plaintiffs knew the SOS transaction KPMG proposed operated by purporting "to generate losses, generate enough losses to shelter most or all the income," as DDRA's in-house accountant put it. A7009. KPMG promoted the transaction as, and plaintiffs understood it to be, a "turnkey product," A7013, that would mitigate "more than 75 percent" of their income, A4651, for what they knew was the investment of sums of money orders of magnitude smaller. Baldwin, for instance, admitted he "underst[oo]d that the size of the deductions that would be generated by this transaction were large in comparison to the amount of money that [he] was paying." A4721. Although he could not remember the multiple, "it was big." A4721. He also "understood that the loss [he] would need to trigger would have to occur by the end of 2001," A4736, in order to "offset [his] 2001 income," A4705-06.

8

In fact, Baldwin knew that he would put up only about $1.5 million even though he would ultimately claim a loss of almost $22 million—and he conceded "Sunset Management did not lose [$]21,999,107 in cash," nor did he. A4754. His only explanation was that that he "assume[d] that somebody really did lose that money somewhere, otherwise it wouldn't be there. I mean, . . . there must be a loss somewhere." A4755. Plaintiffs' own expert thought plaintiffs' "primary motivation was to generate a tax loss" and testified that he did not believe that anyone "objectively could have believed that Baldwin or Sunset Management actually lost [$]22 million" or, "in the DDRA case, that Shawn Scott had lost $48 million." A2545. He could find "nothing in the record to indicate that Mr. Baldwin or Mr. Scott or any of their advisors could have had any notion where there was going to be an offsetting gain down the road." A2557. Nor can we.

We think no reasonable juror could conclude that plaintiffs' knowledge of a fictional loss generated without economic reality would not have been a red flag, to any ordinary businessman of plaintiffs' knowledge and experience, that the IRS could disallow the transaction. Like plaintiffs' expert, we think "it's a matter of common sense that the IRS [would] frown upon a transaction that generates losses that don't have a connection to economic reality." A2579. And even if plaintiffs may not in fact have been concerned by the generation of fictional losses, they *should* have been, and that is enough to raise a danger signal under Nevada law. *See Woods*, 812 P.2d at 1298 ("If the [recipient] is aware of facts *from which a reasonable person would be alerted* to make further inquiry, then he or she has a duty to investigate further and is not justified in relying on

9

[the statements]." (emphasis added)); *Collins*, 741 P.2d at 821 (describing the question of red flags as a question of "facts that *should have* alerted appellants" (emphasis added)). *Cf. generally, e.g.*, *Neonatology Assocs., P.A. v. Comm'r*, 299 F.3d 221, 234 (3d Cir. 2002) ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril. . . . As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves."); *106 Ltd. v. Comm'r*, 684 F.3d 84, 93 (D.C. Cir. 2012) ("[T]he improbable tax advantages offered by the tax shelter—a $1 million dollar loss from a transaction that earned [the taxpayer] $10,000 (less [his attorney's] fees)—should have alerted a person with [the taxpayer's] business experience and sophistication to the shelter's illegitimacy."); *Fid. Int'l Currency Advisor A Fund, LLC, by Tax Matters Partner v. United States*, 747 F. Supp. 2d 49, 68 (D. Mass. 2010) ("No one with the slightest understanding of the tax laws could reasonably believe that $160 million in basis could be created out of thin air, or that $160 million in income could be made to vanish in a puff of smoke."), *aff'd*, 661 F.3d 667 (1st Cir. 2011).

Moreover, there were other danger signals, albeit flashing less brightly and not sufficient in themselves. These signals nonetheless should have contributed to the suspicion the knowledge of loss generation should already have triggered. For one, there were "business abnormalities" that should have caught plaintiffs' attention. A2584. Normally, for instance, people do not pay fees as large as their investments. And the fact that a prearranged, "turnkey" transaction could generate just the right amount

of losses—for an "investment" and fee orders of magnitude smaller—should have also seemed a serendipitous coincidence indeed. Further, plaintiffs believed that, notwithstanding their understanding that they would claim massive losses through the plan, they might also make a profit from the transaction.

In addition, both Baldwin and Scott testified that Hasting told them the transaction was "a one-time fix," A4791; A1014—something that should have struck them, businessmen experienced in the tradeoffs of tax strategies such as § 1031 exchanges, as improbable. Both Baldwin and Scott understood that § 1031 exchanges merely *deferred* payment of taxes. Scott also explained that "you experience a loss" by buying high and selling low on the real estate market. A4838. Both men understood that acquiring corporations holding net operating losses would result in tying up assets over the long term. And Baldwin testified that he knew that to be eligible for a 90 percent tax credit through the Virgin Islands Economic Development program, "you have to completely uproot your life." A4700. But, they testified, Hasting said the SOS transaction "was a one-time fix." A4846. "[T]he way [Hasting] described this one was if you do this one, . . . you're not limited by having your capital perhaps tied up in a piece of real property or you're not limited in the future by having a piece of property you don't want to sell; or if you do sell it, you need to do another 1031." A4847.[5] Plaintiffs

_____

[5] Although Scott also testified that he thought "the amount of money you invest as relates to the tax deduction could be substantially different, just like if we did a 1031," such that "the amount of money left in the transaction or spent on the transaction, in my mind, was not related to as a percentage or proportion to the amount of tax savings," A4852, plaintiffs knew § 1031 exchanges were tax deferrals rather than loss deductions, A4837. In addition, plaintiffs knew not only that the SOS transaction would generate tax

11

would have been hard-pressed to think of a reason this transaction—which they already knew purported to generate artificial losses—would have no such strings attached.

There can be no dispute that plaintiffs would have discovered the falsity of KPMG's representations had they properly investigated. (Plaintiffs' expert opined that a tax preparer with only a "fundamental level of competence would understand that . . . he cannot deduct fictional losses." A2558-59.) Instead, they contend that Hasting sufficiently assured them, on the strength of KPMG's reputation and experience, that the tax strategy was legal. But even viewing the evidence in the light most favorable to the plaintiffs, we think no reasonable juror could find that the investigation they performed in response to the red flag was sufficient.

Plaintiffs' inquiry as to the lawfulness of the SOS transaction stopped with their in-house advisors and the assumption that "[i]f KPMG endorses this plan and is a part of this plan, it cannot run afoul of the tax rules." A4855. DDRA's in-house advisors said they did not understand how the transaction worked, but told Scott that "if KPMG says it's okay, . . . then most people are just going to accept it as fact," and "you're going to have to rely on reputation largely." A4796. Given that the SOS plan to "generate enough losses to shelter most or all the income," A7009, should have been a red flag to any ordinary individual with Scott or Baldwin's business acumen, continuing merely to rely

---

savings, but also, and more importantly, that it would do so by loss generation. In fact, while Scott did not know how much DDRA actually paid in taxes as a result of the transaction, he did know that the transaction "generated a loss," A4864, "in the tens of millions of dollars," A4853.

12

on KPMG's conclusory assertions of legality, without some responsive explanation, was unwarranted.[6]

But both Baldwin and Scott, according to their own testimony, failed to independently evaluate the investment potential of the SOS transaction or even read several documents Hasting asked them to sign. Both admitted they never understood the details of the transaction well enough to obtain an informed second opinion or perform the necessary investigation into the legality of the transaction. For example, Scott testified that "the details that they explained to me were very . . . general, and just a general overview. But as far as specifics, . . . I don't know that I ever knew them." A4885. Baldwin conceded that he "never understood the program," A4686, and called it "some sort of wizardry," A4718.

---

[6] Hasting's continuing assertions of legality provided no responsive reason to proceed. Baldwin testified that Hasting told him KPMG's SOS product was better than a competitor's because the competitor's would not "generate the profits that [Hasting's] program would generate and that because it didn't generate the profits that there was more of a chance that it would *attract the attention of the IRS*." A4722 (emphasis added). Similarly, Jerry Mottern, Baldwin's accountant, acknowledged that Hasting said it was possible the IRS could challenge, and disallow, the transaction. Hasting then told Baldwin that, "as part of the paperwork being in order, you should have an opinion from a recognized law firm saying that whatever you're doing is correct and, you know, legal and good." A4723. Hasting also said the transaction "was fully within the law, but there was no guarantee the IRS would say that it was fully within the law or whatever." A4744. Given that the very nature of the transaction—loss generation—was a red flag, and that it would seem to be the IRS's views that would matter, plaintiffs should have viewed comments like these with increased suspicion. Apparently they did not. Instead, Baldwin thought that the tax opinion was "a magic shield" that would prevent him from paying any penalties or interest in the event the IRS disallowed the transaction. A4723. Scott did not recall "ask[ing him]self why isn't KPMG giving [him] a tax opinion if this transaction is so good." A4861.

13

In fact, the record shows that Hasting avoided giving plaintiffs the details of the transaction (beyond the fact that it was based on loss generation, the very red flag in question). As Baldwin testified, Hasting would "dr[a]w an outline of the transaction" on a white board but "then erase[] it pretty quickly," A4710, while changing the details of the proposed transaction over several meetings, *id.*; A4715). And although Baldwin claimed he was drawn to the transaction by the tax benefit and the profit potential, Baldwin never had Hasting "do any kind of an analysis for [Baldwin] of how [Baldwin] could make a profit on the transaction." A4705. Scott, similarly, decided to rely on KPMG[7] even after Hasting refused to provide "explicit descriptions" of the transactions so that Scott could "take it to someone, like maybe a big law firm, that might understand some of this, and to have them look at it." A4797. Hasting said that KPMG had "spent a fortune to get these structures set up, and we can't just give you that kind of information because it's proprietary." *Id.* But even if this explanation was plausible, *cf. Nev. Sav. & Loan Ass'n v. Hood*, 839 P.2d 1324, 1328 (Nev. 1992), it was not responsive to the danger signals in question: As Scott testified, his accountant or attorney would advise him, in response to the less-than-complete picture Hasting provided, that "this piece seems fine, but we can't tell you from the start to the finish that all the pieces are going to line up and fit together perfectly." A4797. And neither Baldwin nor Scott

---

[7] When asked whether "it ever occur[red] to [him] whether the government would think it was a good thing or a bad thing that DDRA was going to do this transaction and avoid payment on $17 million in taxes," Scott replied, "That's exactly why I relied on Carl Hasting and KPMG to trust—I put our future in their hands." A4853.

14

engaged independent legal counsel or sought independent advice (even though the KPMG engagement letter advised them to do so).[8]

While it may be that, where a plaintiff who perceives—or should perceive—a danger signal may fulfill his duty to investigate by communicating his concerns to the maker of the representations and receiving "a plausible answer," *see, e.g.*, *Nev. Sav. & Loan Ass'n*, 839 P.2d at 1328, we do not think a reasonable juror could view Hasting's representations as responsive to the danger signals in question. The undisputed facts, including evidence from plaintiffs' own deposition testimony, reveal their efforts to remain consciously ignorant despite the red flag of loss generation. Plaintiffs testified

---

[8] In fact, at his deposition Scott admitted that he signed, without reading, a November 26, 2011 letter from DDRA to Lehman Brothers that represented that DDRA had "consulted with its own financial, tax and legal advisors with respect to the transactions and IRS [N]otice 2000-44." A4900. Notice 2000-44, of course, explains why the transaction at issue is unlawful. Baldwin signed a similar letter.

Scott also testified that Hasting told him that:

> [S]ometimes the IRS will . . . order that a transaction be discontinued. . . . [W]hen they do that, it validates—I guess that's the best word—that the transaction was okay before. So if they say you can't do this anymore, then his reasoning was that meant—that must mean, to some extent, that it was okay before, otherwise they would just—they wouldn't have to change the rules or the laws. They changed the law, therefore validating what was being done before, that they don't want you to do that anymore, but it was okay to do.

A4851. We have found no further testimony to indicate that Scott asked whether the IRS had indicated it would "discontinue[]" the proposed transaction here—for if he had asked, he might have learned of IRS Notice 2000-44. Similarly, although Scott testified that Hasting "described people—instances where the IRS had looked at the transactions and allowed them," A4858, Scott also testified that he "remember[ed] Carl talking about plans that didn't withstand the scrutiny and that this was not one of those," A4859. There is no indication that Scott sought any explanation as to *why this* transaction would be allowed.

15

that Hasting assured them the transaction was legal and had been vetted at the highest levels of KPMG, which was the best in the business and could be trusted, and he assured them that KPMG had succeeded in similar transactions before. But this response was no explanation for how losses—losses plaintiffs knew they were not actually suffering—could be artificially generated and then accepted by the IRS. To the contrary, as explained above, the record—of plaintiffs' own making, by their own statements—is replete with evidence of plaintiffs' conscious ignorance and a lack of any reasonable effort to understand the proposed transaction or why, notwithstanding this danger signal regarding its legality, it could succeed.[9]

## B.

<hr />

[9] In other words, a reasonable factfinder could only conclude that neither Baldwin nor DDRA had reasons to justifiably understand the generation of artificial losses to be lawful. For example, when asked whether "Sunset Management actually put up $21,999,107 that it actually lost of its own funds," Baldwin answered no. A4754. He conceded that "we put up 1.5 [million dollars]," but that he did not "know that today we have actually lost it today, per se." *Id.* He admitted that neither he nor "Sunset Management in 2001 [went] out-of-pocket more than the roughly $1.5 million." *Id.* Furthermore, he conceded that "Sunset Management did not lose 21,999,107 in cash," nor did he. A4755. When asked how that loss could then not be "artificial," and whether he was "aware of anybody affiliated with [him], since it was ultimately [his] tax return, who actually lost that kind of money," Baldwin stated, "I assume that loss comes from these derivative transactions," and that he did not "know what the rules are governing derivative transactions." *Id.* He then said that he "assume[d] that somebody really did lose that money somewhere, otherwise it wouldn't be there. I mean, there is—there—I mean, I've never thought about it this way, but it seems to me that there must be a loss somewhere." *Id.* The problem, of course was that there was no such loss, and this information would have "serve[d] as a danger signal and a red light to any normal person of [Baldwin's] intelligence and experience." *Collins*, 741 P.2d at 821.

16

The court erred, however, in concluding plaintiffs could not establish proximate cause for purposes of their negligence claims.[10] Accordingly, we will reinstate those claims and remand for further proceedings.

"A negligent defendant is responsible for all foreseeable consequences proximately caused by his or her negligent act." *Taylor v. Silva*, 615 P.2d 970, 971 (Nev. 1980). Plaintiffs contend that, but for Hasting and KPMG's misrepresentations that the SOS transaction KPMG proposed was legal and would survive IRS scrutiny, they would have pursued other tax strategies for which they would have paid no penalties or interest, no fee to KPMG, and possibly less in taxes. Both Baldwin and Scott testified they were considering alternatives—such as § 1031 exchanges, investing in companies with net operating loss, and moving to the Virgin Islands—before Hasting introduced them to the SOS transaction. Under this theory, plaintiffs have adduced sufficient evidence to show that Hasting and KPMG could have reasonably foreseen their actions in reliance—even if not justifiable—on KPMG's misrepresentations. *See, e.g.*, *Dakis for Dakis v. Scheffer*, 898 P.2d 116, 118 (Nev. 1995).[11] Plaintiffs' involvement does not

---

[10] This observation applies equally to plaintiffs' breach of fiduciary duty claims, but we affirm the entry of judgment on those claims for the reasons discussed below.

[11] The district court reasoned that plaintiffs could not establish proximate cause because they were responsible for the SOS transaction's failure. We disagree. Although the economic substance doctrine "turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind them," *ACM P'ship*, 157 F.3d at 247, "where a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations," *id.* at 248 n.31. Whatever plaintiffs' subjective motives, and whatever they understood, Hasting and KPMG had structured (and carried out) plaintiffs' SOS transactions to generate large, purportedly deductible losses without any corresponding basis in economic reality. As "a transaction

17

necessarily break the chain of proximate cause, for "where [another] party's intervening intentional act is reasonably foreseeable, a negligent defendant is not relieved of liability." *Id.* (alteration in original) (quoting *El Dorado Hotel v. Brown*, 691 P.2d 436, 441 (Nev. 1984)).[12] Although "[c]ontributing fault, if any, on [plaintiffs'] part could reduce [their] recovery under the doctrine of comparative negligence," it would "not negate a finding that [KPMG's] negligence was a proximate cause of [their] injuries." *Taylor*, 615 P.2d at 971-72.

## C.

Because plaintiffs have produced sufficient evidence to reach a jury on proximate cause, we must also reverse the dismissal, on res judicata grounds, of plaintiffs' RICO claims that the court earlier compelled the parties to arbitrate. Although a federal court may generally determine the res judicata effects of a federal judgment on claims to be

---

specifically designed to produce a massive tax loss devoid of economic reality," plaintiffs' SOS transactions fatally "lack[ed] objective economic substance." *Sala*, 613 F.3d at 1255. The transaction was bound to fail, regardless of plaintiffs' motivations, because of the way it was designed by KPMG.

[12] *See also, e.g.*, *Drummond v. Mid-W. Growers Co-op. Corp.*, 542 P.2d 198, 203 (Nev. 1975) ("An 'efficient intervening cause' is not a concurrent and contributing cause but a superseding cause which is itself the natural and logical cause of the harm. Not every intervening cause, or even every negligent intervening cause, acts as a superseding cause absolving the prior negligence." (citations and internal quotation marks omitted)); *Konig v. Nev.-Cal.-Or. Ry.*, 135 P. 141, 153 (Nev. 1913) ("[I]f the probable cause of an injury or accident is the first wrong done, then that becomes the proximate cause, regardless of how many acts may have been performed or how many agencies may have intervened between the first act or wrong and the catastrophe. Any number of causes may intervene between the first wrongful act and the final injurious consequences, and, if with reasonable diligence they are such as might have been foreseen, the consequences as well as every intermediate result is to be considered in law as the proximate result of the first wrongful cause.").

arbitrated, *see John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132, 138 (3d Cir. 1998), neither proximate cause, as noted, nor justifiable reliance can sustain the dismissal here. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49 (2008) (explaining that justifiable reliance is not required to prove RICO's federal statutory predicate acts of racketeering).[13] We will not consider in the first instance whether plaintiffs failed to prosecute these claims.

### D.

We will affirm the grant of summary judgment on plaintiffs' claims of breach of fiduciary duty. We think no reasonable juror could find that, under the circumstances, there was a confidential or special relationship between plaintiffs and KPMG. The evidence, taken in the light most favorable to the plaintiffs, establishes that plaintiffs had an arm's length relationship with Hasting and KPMG and, moreover, that, given plaintiffs' knowledge of the scheme's loss-generation mechanism, any confidence they reposed in KPMG was imparted unreasonably.

### 1.

Plaintiffs do not claim an accountant-client relationship is a fiduciary relationship as a matter of law, and they have directed us to no case so holding. *See generally Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 881 (9th Cir. 2007) (collecting cases covering "categories of relationships" in which "[t]he Nevada Supreme Court has held that fiduciary duties arise as a matter of law"). But a similar duty may arise "[i]n

---

[13] The court provided no explanation for the res judicata dismissal, and we can discern no potential grounds beyond proximate cause and justifiable reliance.

relationships falling outside these categories," known as "confidential relationships," when "'one party gains the confidence of the other and purports to act or advise with the other's interests in mind.'" *Id.* (quoting *Perry v. Jordan,* 900 P.2d 335, 338 (Nev. 1995) (per curiam)).

Although the Nevada Supreme Court has said that "[a] confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other," *Randono v. Turk*, 466 P.2d 218, 222 (Nev. 1970) (citation omitted), it has also noted that "[a] fiduciary relationship exists when one has *the right* to expect trust and confidence in the integrity and fidelity of another," *Powers v. United Servs. Auto. Ass'n,* 979 P.2d 1286, 1288 (Nev. 1999) (per curiam) (emphasis added). More specifically, the plaintiff must show "that the conditions would cause a reasonable person to impart special confidence" in the trusted party. *Mackintosh v. Cal. Fed. Sav. & Loan Ass'n*, 935 P.2d 1154, 1160 (Nev. 1997) (per curiam). "[A] standard friendly but arms-length business relationship" is not a confidential or special relationship. *Giles*, 494 F.3d at 883-84 (citing with approval *Yerington Ford, Inc. v. Gen. Motors Acceptance Corp.,* 359 F. Supp. 2d 1075, 1091 (D. Nev. 2004), *rev'd in part on other grounds*, *Giles,* 494 F.3d 865). "Whether a confidential relationship exists generally is a question of fact, but at summary judgment the Court must determine whether 'a reasonable jury could conclude that a reasonable person would impart special confidence in the other party and whether that other party would

20

reasonably know of this confidence.'" *Hernandez v. Creative Concepts, Inc.*, 862 F. Supp. 2d 1073, 1091 (D. Nev. 2012) (quoting *Yerington Ford*, 359 F. Supp. 2d at 1088).[14]

**2.**

We think the evidence here, taken in the light most favorable to plaintiffs, could not lead a reasonable jury to find a confidential or special relationship between plaintiffs and Hasting or KPMG. Instead, the undisputed portions of the record evince an arm's length relationship in which any trust reposed was imparted unreasonably in the face of plaintiffs' knowledge of the proposed transaction's loss-generation scheme.

While it is undisputed that Hasting and KPMG had greater tax knowledge than plaintiffs, Baldwin and Scott were "experienced businessm[e]n, capable of taking adequate precautions to protect [their] business[es] and [their] business transactions," *Yerington Ford*, 359 F. Supp. 2d at 1091. In fact, Baldwin testified that he did not "blindly follow[]" Hasting, A4704, and that "[a]nyone who knows Shawn Scott knows that nobody, nobody exercises control over Shawn. . . . [or] has Shawn do anything but what Shawn wants to do," A4669. Instead (even though this investigation was insufficient for

---

[14] The Ninth Circuit Court of Appeals in *Giles* appeared to treat confidential and special relationships as two closely related but different types of relationships. *See Giles*, 494 F.3d at 881 ("Nevada law recognizes a duty owed in 'confidential relationships' . . . . Nevada also recognizes 'special relationships' giving rise to a duty to disclose . . . ."). At least with regard to a duty to disclose, we see no positive indication in Nevada's case law that the two types of relationships are to be treated differently. *See, e.g., Perry*, 900 P.2d at 337 (quoting, in a case identified by the *Giles* court as a "confidential relationship" case, *Mackintosh*, 855 P.2d at 553, a case identified by the court in *Giles* as a "special relationship" case). Plaintiffs—who cite *Yerington Ford*'s statement that the question is whether "a reasonable jury could conclude that a *reasonable person* would impart special confidence in the other party and whether that other party would *reasonably* know of this confidence," 359 F. Supp. 2d at 1088—appear to agree.

purposes of justifiable reliance), plaintiffs sought the views of their in-house accountants and attorneys—people who continued to assist in the preparation of their tax returns. After all, they were considering several other options, from those offered by The Heritage Group and Cornerstone Strategic Advisors to § 1031 exchanges and participation in the Virgin Islands Economic Development program. It was only after several meetings with Hasting, and a chance to check the track record of KPMG's partner Gramercy, that plaintiffs chose to pursue the SOS tax strategy. They also managed to negotiate a discount of KPMG's proposed fee.

The record also contains undisputed evidence indicating the parties did not repose full trust in each other. As noted, as plaintiffs themselves testified, Hasting consistently refused to provide details of the transaction to plaintiffs, even when Scott asked for details. That dynamic is anything but confidential and trusting. It would not permit a reasonable jury to conclude that Hasting or KPMG "caused a reasonable person to place more confidence and reliance on [KPMG] than would be placed on an ordinary" accounting firm, because, notwithstanding KPMG's superior reputation, the evidence does not show that plaintiffs "could reasonably expect [KPMG] to pay greater attention to its interests than would an ordinary" accounting firm. *Mackintosh v. Jack Matthews & Co.*, 855 P.2d 549, 554 (Nev. 1993). Furthermore, in their engagement letters with KPMG, plaintiffs indicated they understood that "KPMG shall be obligated only for services specified in" the letters. A795, A802. Those letters continued that:

> Unless expressly provided for, KPMG's services do not include
> representing you in the event of a challenge by the IRS or other tax or
> revenue authorities. KPMG will not issue a tax opinion letter to you under

22

this engagement, but will facilitate issuance of an opinion letter by legal counsel.

*Id.* The letters also explicitly recommended that Baldwin and Scott "seek independent advice concerning the investment aspects of the proposed transactions before agreeing to participate in the transactions." A795-96, A802-03. These passages clearly put KPMG and plaintiffs at arm's length.

Finally, plaintiffs should have been suspicious of KPMG given their knowledge that the proposed transaction operated by generating large artificial losses. We therefore believe, for the reasons laid out above, that a reasonable jury could not find that reposing trust in KPMG was justifiable or reasonable. In short, "[e]ven resolving every factual dispute in [plaintiffs'] favor," we find that, given the unreasonableness of plaintiffs' position and the undisputed evidence that the parties operated at arm's length, no reasonable finder of fact could find" that a confidential or special "relationship existed" between plaintiffs and KPMG or Hasting. *Giles*, 494 F.3d at 883.

**III.**

Plaintiffs also argue they should have been permitted to supplement the record to include an unproduced sworn declaration by Hasting and that the court should have compelled the production of various documents KPMG refused to produce. Plaintiffs moved to supplement the record on June 5, 2014, the same day the court granted summary judgment, and the court therefore subsequently denied the motion to supplement as untimely. After summary judgment, the court also denied plaintiffs' April 22, 2014 motion to compel as moot. Although we express no view on the

propriety of those rulings at the time and under the circumstances they were issued, we think the parties and the court should have an opportunity to revisit those arguments given our reinstatement of plaintiffs' negligence claims. Accordingly, we will vacate and remand for further consideration the denial of plaintiffs' motions to supplement and compel. Having reviewed plaintiffs' proffer, however, we find these documents do not alter our assessment of plaintiffs' failure to show justifiable reliance or a fiduciary relationship with KPMG or Hasting.[15]

## IV.

For the foregoing reasons, we will affirm in part, reverse in part, vacate the denial of plaintiffs' June 5, 2014 motion to supplement and April 22, 2014 motion to compel, and remand for further proceedings consistent with this opinion.

---

[15] For instance, plaintiffs argue that "[t]he material evidence and issues at stake in these discovery motions include" evidence that KPMG told Hasting the tax strategies were lawful, and he believed as much; evidence from a KPMG accounting expert as to how KPMG misled him into believing the transactions were lawful; and scripts KPMG developed to explain to clients why its tax products were not "too good to be true." Appellants' Br. 65-66. But, as noted, the relevant justifiable reliance question is what danger signals *plaintiffs* perceived (or should have perceived), and what inquiry they undertook in response. As we have explained, we have reviewed plaintiffs' own deposition testimony in the light most favorable to them and determined—leaving aside what KPMG might have done, especially internally—that a reasonable jury could not find they justifiably relied on the representations of lawfulness they claimed to have received.